**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 72-67 (BAH) |
| JOHN MILTON AUSBY, | Chief Judge Beryl A. Howell |
| Petitioner/Defendant | |

## MEMORANDUM OPINION

On the evening of December 14, 1971, Deborah Noel was violently raped and murdered in her apartment in northwest Washington, D.C. Around 5 P.M. that day, Noel had left work early to prepare dinner for her boyfriend, but when he had arrived at her apartment close to an hour later, he received no response when he knocked on her door. After knocking again more forcefully, he heard Noel scream and then heard a gunshot. With the help of building staff, the door to the apartment was opened and inside, Noel's body was found lying on her bed next to an open window. Noel was unclothed from the waist down and had been shot point-blank in her temple. At the crime scene, the police found, among other things, labeled vials of scented oil, a single usable latent fingerprint of the defendant, the bullet that killed the victim, and hairs of unknown origin. Three days later, in New York City, the defendant John Milton Ausby was arrested in possession of a gun, which was loaded except for two spent cartridges with the same type of bullet used in the murder, and a small unlabeled vial of oil, which were similar to the oil vials found on the murder scene that had been sold to the defendant shortly before the murder.

At trial, the prosecution presented overwhelming evidence of the defendant's guilt. The oil vials and fingerprint were conclusively linked to the defendant, and the testimony of two expert witnesses established that the defendant's loaded gun fit the profile of the likely murder weapon. Three witnesses saw the defendant in the apartment building in the week preceding the

murder, one of whom saw the defendant loitering outside the victim's apartment on two separate evenings. Another witness, who lived two doors down from the victim, had her apartment broken into, and she found that whoever had broken in had left a rag doused in scented oil. In addition to this evidence, a forensic examiner from the Federal Bureau of Investigations ("FBI") testified that, based on his scientific analysis, the hairs found at the crime scene were microscopically similar to or microscopically alike known hairs of the defendant. The defendant was convicted of felony murder for which he was sentenced to life imprisonment, and "carnal knowledge while armed," for which he was sentenced to 10 to 30 years to run concurrently with his life sentence.

In September 2015, following review of the defendant's case by the Department of Justice ("DOJ") and the FBI, the government informed the defendant that the expert hair testimony presented at his trial was false and misleading, and that the government knew or should have known this at the time of the trial. Based on this concession, in September 2016, the defendant filed his first habeas petition, pursuant to 28 U.S.C. § 2255, forty-four years after he was sentenced to life in prison, challenging his conviction on the ground that the government's knowing use of the false hair testimony materially affected the outcome of his trial, in violation of the Fifth Amendment and *Napue v. Illinois*, 360 U.S. 264 (1959). Pet'r's Mot. Vacate under 28 U.S.C. § 2255 ("Pet'r's Mot."), ECF No. 1. For the reasons explained below, the defendant's motion is denied.

## I. BACKGROUND

The government reports that its files, "which presumably included reports, grand jury transcripts, witness statements, photographs and trial exhibits" as well as "all physical evidence

recovered in this case no longer exist[].”  Gov't's Opp'n Pet'r's Mot. (“Gov't's Opp'n”) at 3.[1]

Consequently, the Court relies on the trial transcript, which is available in paper format.

Following review of the evidence presented at the defendant's criminal trial and other relevant

history of the case, the developments related to the use of comparative hair analysis in criminal

trials is summarized.

### A.  THE TRIAL

The original indictment in this case not only charged the defendant with the burglary,

rape, and murder of Deborah Noel, but also charged the defendant with the rape and murder of

two other women, Sharan Tapp and Sherry Frahm.  Gov't's Opp'n at 2, n.2; *see also United*

*States v. Ausby*, 489 F.2d 1273 (D.C. Cir. 1974) (order affirming the defendant's conviction and

noting that the accompanying memorandum was not published); *United States v. Ausby*, No. 72-

2202, slip op. (“*Ausby* slip op.”) at 2 (D.C. Cir. Jan. 30, 1974).  The charges related to Tapp and

Frahm were severed and the charges related to Noel's murder were tried first.  *Ausby* slip op. at

2. As discussed more fully below, *see infra* Part I.B, the defendant was also ultimately convicted

of the murder of both Tapp and Frahm but those convictions are not at issue in this case.

### 1.    The Prosecution's Opening Statement

The government's opening statement outlined the charges against the defendant and its

theory of the case:  on December 14, 1971, the victim arrived home from work “about 5:40 and

went into her apartment, where she lived alone.”  Trial Tr. 8/21/72 at 137–38.  The defendant

was “already there” in the apartment and “seeing her alone attacked her.”  *Id.* at 138–39.  She

screamed and resisted, and was “knocked [] temporarily unconscious” by the defendant, after

which he took her “into [her] bedroom” and “raped her.”  *Id.* at 139.  At approximately 6:00

---

[1]     At the time of the defendant's conviction, the United States Attorney's Office had a 15-year retention
policy for its files, while the D.C. Metropolitan Police Department had a 25-year retention policy.  *Id.* at 3 n.4.

P.M., the victim's boyfriend arrived at her apartment and knocked on her door. *Id.* He received

no response and knocked again, and then heard the victim scream followed by a gunshot. *Id.*

That gunshot was the sound of the defendant "pull[ing out] a high velocity revolver, press[ing] it

up behind [the victim's] left ear, and pull[ing] the trigger." *Id.* The victim's boyfriend ran

downstairs to get help to enter the locked apartment, during which time the defendant "opened

th[e] bedroom window," jumped "to the ground and then effectuated his escape." *Id.*

      The government next summarized the evidence that it would use to support this narrative.

One witness had seen the defendant in the building on December 9 and December 10, 1971,

"some three days before the crime occurred in front of and near the deceased's apartment." *Id.* at

144. A fingerprint left in the victim's apartment would prove to be of the defendant. *Id.* at 142.

The owner of the business who sold the defendant the "vial[s]" or "dram[s] of oil" would

identify the defendant as the person to whom he had sold the vials a week before the murder. *Id.*

at 141–42. Another expert would testify that certain hairs from the crime scene, under his

analysis, were microscopically "identical" to the defendant's hair along "nineteen microscopic

characteristics, . . . no more no less." *Id.* at 142–43.

      The prosecution also planned to present witnesses to testify that the defendant "was

arrested three days" after the murder "[on] December the 17th," in New York City, and that

when the defendant was arrested, he had a ".357 Magnum" on his person, with "four live rounds

and two empty casings in the chamber. *Id.* at 140, 144. The prosecutor stressed that the

evidence would show that, although the bullet "recovered from the body of the deceased was too

mutilated for the ballistics expert to make a positive match," an expert would testify that the

bullet had been fired from a gun with a barrel that had "five lands and grooves and a right twist,"

and would testify that the defendant's gun had "five lands and grooves and a right twist."  *Id.* at 144.

Defense counsel made no opening statement.  *See id.* at 136.  ("[The defendant] do[es] not wish to make an opening statement").

### 2.    The Government's Trial Evidence

The government presented twenty-three witnesses over the course of the four day trial, including three witnesses who were in the building at the time the murder occurred; police officers who responded to the crime scene after the discovery of the victim's body; a vendor who sold the defendant the vials of oil found at the crime scene; four witnesses who were in the building in the week leading up to the murder; a witness and two officers who encountered the defendant shortly before and during his arrest in New York City; and five forensic experts.

#### i.    *Witnesses the Day of the Murder*

##### (a)    *Grace Pyles*

Grace Pyles lived "two doors" from the victim's apartment.  *Id.* at 145–47.  Pyles testified that around 5:45 P.M. on the day of the murder, she "heard a blood-curdling scream," and ten minutes later, "heard a shot."  *Id.* at 146–47.  Pyles knew the time of day when this occurred because she had been on the phone with her aunt, whom she always called "at that time."  *Id.* at 147.  On cross-examination, Pyles admitted that she was not absolutely certain of the date on which this occurred, but was "pretty sure," that it was the 14th, the day of the victim's murder.  *Id.* at 149.

##### (b)    *Richard Ecroyd*

Richard Ecroyd had been the victim's boss for "[a] little longer than two years."  *Id.* at 151.  He testified that on the day of her murder, the victim left work early, "about five," to go to her apartment to "prepare a meal for [him]."  *Id.*  He left the office around 5:25 P.M. and "went

straight to [the victim's] apartment," where he received "no response" after he knocked on the door. *Id.* at 151–52. He knocked "[a] second time louder" and heard the victim scream, "right after" which he "heard a gunshot." *Id.* at 152–54. He "went down to the receptionist," to get the key to the apartment, but when they returned, they found that the chain lock was engaged, so they had to "contact[] the maintenance man" for help. *Id.* at 152. The maintenance man was also unable to open the door when he first arrived and had to go "get a tool to open the door," and finally opened the victim's door. *Id.* Once inside, Ecryod and the maintenance man "found [the victim] . . . laying on the bed" with no pulse, blood next to her head, "her dress [] pulled up above her waist" and "down below her bust." *Id.* at 152–53. Ecroyd also observed that a large window in her room was open. *Id.* at 153.

On cross-examination, Ecroyd confirmed that he had been dating the victim prior to her death, *id.* at 155, and that he did not see "anyone in the hallway" when he arrived at the apartment building or "[a]t the time of the scream," *id.* at 160, 169. He knew the time he arrived at the victim's building because he "always look[ed] up at the clock" when he left work and had noted that it was "5:25" when he left. *Id.* at 167. The victim had not been home in a while because she had been "staying with her mother prior to [the murder]" for "about two weeks," and the murder "was the first day that she was back in her apartment." *Id.* at 162. He provided more detail about the state of the crime scene, noting that the "bed [was] unmade," and the victim's coat was "on the floor between her legs." *Id.* at 166–67.

(c) *Charles Wesley*

The building's "maintenance engineer," Charles Wesley, confirmed that "the desk clerk" had called him up to the victim's apartment on the day of the murder, where he found Ecroyd. *Id.* at 173–74. After Wesley got the tool to disengage the chain lock, he and Ecroyd "entered the apartment" and saw the victim "lying across the bed . . . with [her] dress or sweater about

6

midway up." *Id.* at 175–76. He "immediately went to the telephone and called the ambulance," and stayed until "the police arrived." *Id.* at 176. While he was in the apartment, he saw that "the kitchen door," which was an external "service entrance" for building employees, was "closed, but it was unlocked" and there were "a few scrape marks below the [kitchen] door knob." *Id.* at 176–77.

Wesley also testified that on December 10, 1971, four days prior to the murder, he had been "t[aken] by surprise" by a "negro" stranger whom he "couldn't recognize" walking around the first floor of the building "around 9:30" in "the morning," wearing "one of these African gowns [] and a fez." *Id.* at 179–80. He also noted that, of the six entrances into the apartment building, two of them, "the front door and the Ashmead Street entrance," were left open until at least 7:00 P.M. each day. *Id.* at 177–78.

On cross-examination, Wesley testified that he did not have direct access to each apartment, but had to get a key from the "switchboard" any time he needed to access an apartment to do work. *Id.* at 181–82. As for the stranger he had seen, Wesley explained that the man was alone, was not "conversing with anyone," and was "walking down the hall towards the elevators." *Id.* at 183–85. When asked about entrances to the apartment building, he confirmed that "no one [was] specifically responsible for locking the Ashmead entrance" to the building, but noted that the pharmacists at a local drug store "usually [would] lock it when they leave." *Id.* at 189. He admitted that if the pharmacists did not lock the door, it would remain unlocked until he or a resident locked it, which he did not do regularly. *Id.* at 190, 193–94. He further testified that the Ashmead entrance "permit[ted] access to the elevator portion[ of the building] without coming in contact with the receptionist's desk in the lobby." *Id.* at 190.

(a) *Officer Donald Cherry*

Officer Donald Cherry arrived at the scene of the crime, Apartment 326, at approximately 6:45 P.M with three other officers. *Id.* at 202. A few officers were already at the scene, and in front of them was "the lifeless body of a young woman lying on her back across the bed." *Id.* at 203. She was "nude from the waist down" and at the foot of the bed were "a tweet coat," "a black leather purse," "a pair of pantyhose, a pair of panties, [and] two shoes." *Id.* at 203–04. A "small glass vial containing some sort of liquid" was protruding from under the coat, and another vial was "at the night stand." *Id.* at 204. The vials were labeled "Jasmine" and "Man Ranjan," respectively. *Id.* at 219–20. Stockings were "tied around [the victim's] left wrist and [around] her neck," and the sheets around her "were in great disarray." *Id.* at 203. Of the "three windows" in the room, "two of them were closed and the third was open." *Id.* at 204. Officer Cherry "dusted extensively" for fingerprints, and found none suitable for comparison in the bedroom. *Id.* at 204. Officer Cherry also testified that he took as possible evidence the "coat lying on the floor at the foot of the defendant," the victim's dress and pantyhose, a "green towel" from the bedroom, carpet tile, the victim's pillow and blanket, the "slug fragments" of a bullet found next to the victim's head, and "loose hairs" from the bedspread and the "knees" and "stomach of the victim." *Id.* at 209–18.

On cross-examination, Officer Cherry testified that there was a "team" of officers reviewing the crime scene and denied seeing any of them "touching or moving anything" when he arrived at the scene of the crime. *Id.* at 237–38. He explained that other officers searched for fingerprints in other locations in the apartment, and testified that, to his knowledge, identifiable fingerprints were found elsewhere, but he did not elaborate. *Id.* at 243–45, 250–51.

*(b)     Officer Robert Laughery*

Robert Laughery, a technician for the "Mobile Crime Lab" of D.C. MPD, testified that he arrived at the victim's apartment on the day of the murder at approximately 6:45 P.M., and while inspecting the crime scene, observed "two footprints" in the alley "directly" below the "windows of the apartment," and nearby he found "three perfume vials," one "chapstick," and a key. *Id.* at 258–59, 264.  He took photographs of the area and plaster casts of the foot impressions. *Id.* at 260–61.[2]  On cross-examination, Officer Laughery testified that he dusted the kitchen in the apartment and the chapstick he found in the alley for fingerprints, which returned a "negative result," and that he did not "dust the vials for fingerprints." *Id.* at 269–71.

*iii.     Oil Vial Evidence*

Artis Hinson, the owner of Phoenicia, Ltd., a store specializing in "oils, incense, anything that is imported into the United States," testified about his interaction with the defendant. *Id.* at 285–86.  Hinson began selling oils in his store in December 1970, and as of October 1971, was selling roughly 40 different oils, all supplied by the same vendor in India. *Id.* at 288–89.  Hinson testified that "it would be highly unlikely" for another person in the District of Columbia to import oils from this vendor, given that the vendor "promised [Hinson] an exclusive territory in the area" and told Hinson that he "had no one else at the time" in the Washington, D.C. area to whom he sold oil. *Id.* at 289.

Hinson identified the defendant in open court as "Jahan," a "frequent customer" at Hinson's store. *Id.* at 290–91.  The defendant would come in "once or twice a month" and would buy "oils and once in a while some [] Eastern clothes." *Id.* at 291.  He testified that on December 6, 1971, the defendant came into Hinson's store wearing a "robe" that was "brown or

---

[2]       The parties later stipulated that the shoe prints were "worthless for the purpose of comparison" due to the "lack of detail appearing in the [] plaster cast." *Id.* at 277–78.

beige," and a fez, *id.* at 302, and purchased "five or six" "dram-size bottles" of different oils, named "Fantasia," "Gardenia," "Night Queen," "Jasmine 68," and "Manoranjan." *Id.* at 293–296. The defendant's purchase was an unusually "large sale" for Hinson, and so he not only gave the defendant a receipt, dated "12-6-71," but he also hand-wrote "the names of the oils on the labels [of the vials]," which he only did when there was "some reason to expect the [customer] would get the oil mixed up." *Id.* at 294–98. Hinson confirmed, both by his handwriting and by smell, that the vials of oil in evidence and collected at the crime scene were vials of his "Jasmine," "Night Queen," "Gardenia," and "Manoranjan" oils. *Id.* at 296–301. He noted that the vial of Manoranjan oil that he had sold to the defendant was "the first and only sale" that he had made of that oil. *Id.* at 298.

Hinson further testified that "[a]pproximately a week later," the defendant returned and "purchased two drams of oil." *Id.* at 303. Hinson found this unusual because the store "generally d[id]n't have repeat purchases yet on the same oils in such a small amount of time," and so Hinson "asked [the defendant] why" he was purchasing oils so frequently, "knowing he purchased such a large number the week before." *Id.* at 305. The defendant responded that he had "lost [his previous purchases] going through a window." *Id.* at 306. Hinson testified that he "would think [that day] was a Wednesday," which would be the day after the victim's murder. *Id.* at 306. In response to a question from the Court, Hinson testified that there was no doubt in his mind this interaction occurred "a week later." *Id.* at 306.

Defense counsel did not cross-examine Hinson.

### iv.    The Defendant's Presence in the Building Prior to the Murder

The government called three witnesses to testify about the presence of the defendant in the victim's apartment building in the week leading up to murder.

*(a)      Dorothy Rager*

Dorothy Rager lived "right next door" to the victim.  Trial Tr. 8/22/72 at 316.  She

testified that, on December 9, 1971, after returning home from her "nine to five" job, she saw a

man "walking right in front of [the victim]'s door," dressed "in a robe, a long robe, that was red

striped and sort of tan striped, . . . wearing a red fez."  *Id.* at 317–18.  She testified that she "got a

look at his face," and observed that the stranger "was black."  *Id.* at 318.  The next night, after

work, she "saw [the man] at exactly the same place" outside the victim's door, "but he was

dressed entirely differently, wearing a tweed, gold and brown tweed jacket," and he was

"carrying a . . . . sort of a fat case."  *Id.* at 319.  She observed that he was "walking in front of

[the victim's] door again, doors," clarifying that there were "two doors[] to each apartment."  *Id.*

She was certain that the man was the same man as the night before, especially noting the shape

of his nose and his beard.  *Id.* at 320–21.  She attributed her ability to recognize the defendant to

her hobbies as "an artist and a sculptor."  *Id.* at 321.

On February 17, 1972, Rager was shown "ten or so" photographs of "different

individuals," by the prosecutor and "[t]wo detectives."  *Id.* at 325.  She testified that she "went

through them" and was "positive" that she picked out the picture of the man she "saw in the hall

on those two evenings."  *Id.* at 322–24.  In court, she again selected the defendant's photograph

from an array of photographs and identified the defendant, in the courtroom, as the same man.

*Id.* at 325–26.

On cross-examination, Rager testified that she had recognized the photograph of the

defendant "immediately."  *Id.* at 326.  She admitted that she had seen a picture of the defendant

in a newspaper around the time he was arrested, but denied that it influenced her perception.  *Id.*

at 339–40.  Despite repeated questions from defense counsel, she was firm that the man she saw

was the defendant, again invoking her artistic ability to explain how she was able to be certain of

the image she had seen, though she admitted that she was wearing sunglasses the first time she saw him. *Id.* at 335, 343–46. She further confirmed that she saw the defendant between 5:30 and 6:00 P.M. on both occasions, and that the "Ashmead Place" door "had no lock on it at th[e] time" of the murder. *Id.* at 335–36.

On redirect, Rager clarified that when she saw a picture of the defendant in a newspaper, she had immediately "dr[awn] a fez and a robe on him and a beard the same as [she] had seen" on the stranger in her hallway, and from this she "concluded that [the defendant] was the man [she] saw." *Id.* at 346. In response to a final question from the Court, Rager testified that she was "about five or six feet" away from the defendant both times she saw him. *Id.* at 347–48.

### (b)  *Susan Shook*

Susan Shook lived "two doors down" from the victim and testified that on December 9, 1971, she arrived home between 5:30 and 6:00 P.M with a friend to find that the top lock of her door, to which she did not have a key, had been engaged. *Id.* at 350–51. Shook and her friend "went downstairs to the desk to get a key." *Id.* After getting inside her apartment, Shook observed most of her cats "hiding in the bathroom" with one "crouched up on the sofa," which was unusual because "usually they greet[ed her] at the door with meows and stuff." *Id.* at 351–52. She noticed that her apartment "smelled of [a] perfume" she did not recognize, and found milk in one of her cats' bowls, which she "never fed [to her] cats." *Id.* at 351–52. After searching, she found the source of the perfume scent to be "a towel that was left on [a] chest in [her] living room." *Id.* at 353. The next morning, on December 10, Shook "got up around twenty minutes of seven" and while she was getting dressed, "noticed that [her] cat was growling" in a manner she had never heard before. *Id.* at 353. She went toward her kitchen "and got there in time to see the kitchen door, [] the door leading to the hallway, . . . close very slowly and very silently." *Id.* at 354. She quickly locked the kitchen door, called "the office"

downstairs, and "[o]ne of the janitors came up" and left a hammer with her. *Id.* She personally

did not contact the police, "but they were contacted" and she spoke with them. *Id.* at 354–55.

She was not cross-examined.[3]

### (c) George Crockett

George Crockett, a "porter" in the apartment building, was the employee who had

responded to Shook's call, and had worked at the apartment building "about a year and six

months" at the time of trial and was. *Id.* at 360–61. The morning of December 10, 1971,

Crockett "g[o]t a call to respond to Shook's apartment between "7:00 or 8:00 . . . in the

morning." *Id.* at 361. As he got off the elevator on the third floor, Crockett saw someone

coming down the hall in "some robes, cream colored, with fringe, and a black fez on his head."

*Id.* The man was "[c]olored" and "had a goatee" and was coming from the direction of Shook's

apartment. *Id.* at 362. After arriving, he noted that "the paint" had been "scrubbed off" the

"bolts and the lock" of the kitchen door, which was "unusual," and he left Shook with a hammer.

*Id.* at 363. Crockett was not cross-examined.

### v. Forensic Evidence

### (a) Expert Hair Testimony

Special Agent Robert Neill worked at the FBI's Microscopic Analysis Unit of the Physics

and Chemistry lab, and testified about the analysis of the hairs found at the scene of the crime.

*Id.* at 374–75.[4] Agent Neill first reviewed his educational and professional background, noting

that he had conducted "between 35,000 and 40,000 individual microscopic examinations" of hair

---

[3]     At the end of Shook's testimony, defense counsel moved for a mistrial on the grounds that evidence of an uncharged crime, unlawful entry into Shook's apartment, had been presented to the jury. *Id.* at 355. The Court denied the motion and instructed the jury "not to consider the testimony of the last two witnesses in any way as proof or tending to show that [the defendant] may have committed any [uncharged] crime." *Id.* at 364–66.

[4]     Prior to Special Agent Neill's testimony, three detectives briefly testified as to the chain of the custody of the hairs in evidence. *Id.* at 368 (testimony of Officer Donald Bazzle); *id.* at 369 (testimony of Detective Ronald Ervin); *id.* at 413 (testimony of Officer Colin Alford).

samples and served as an expert witness "between 200 and 250 [times]." *Id.* at 375–77. He

testified that "microscopic analysis of hairs" was "recognized as scientifically valid among

scientists." *Id.* at 379–83. He identified 43 unknown head and pubic hairs that had been

collected from the victim's body and the crime scene, *id.* at 383–92, followed by his conclusions

that a total of 27 of the hairs were "microscopically identical" to the defendant's known hair

samples, 9 were fragments that were not suitable for comparison, and 7 hairs were

"inconclusive," *id.* at 414–21.[5] Agent Neill had compared a total of 19 microscopic

characteristics between the defendant's known hairs and the hairs of unknown origin. *Id.* He

testified that nineteen was "a fairly adequate [number]" and explained that with this number" of

characteristics being compared, he had never seen a false match. *Id.* at 422–23. Finally, he

testified that for the inconclusive hairs, he "just d[id]n't have any conclusion" as to whether they

matched the defendant's hairs. *Id.* at 419, 422–23.

On cross-examination, Agent Neill stated that he had performed" about 10,000"

comparisons involving hair from black individuals. *Id.* at 423–24. He was "not able to say what

percentage" of those analyses were made by comparing the same "19 microscopic characteristics

found in the[ defendant's] hairs," but Agent Neill added that he "would be quite surprised if any

of" the hairs he had previously inspected "were to microscopically match" the defendant's hairs.

*Id.* at 424–25. He further testified that of the 19 characteristics he had compared between the

hairs in this case, he would "expect to encounter . . . 17 [of those] characteristics" in a large

percentage of black individuals. *Id.* at 426–29. He clarified that he was comparing the

characteristics' "uniqueness" in his analysis, and he analogized his process to comparing human

faces, in that most everyone has "a nose" or a "mouth," but "they vary [] from one individual to

---

[5]     He also testified that he had found five "limb hairs," but further explained that limb hairs "are not suitable for conclusive microscopic comparison purposes." *Id.* at 421.

the next." *Id.* at 430–32. Agent Neill then estimated that the two unusual features of the defendant's hairs were found in "less than five percent" of hairs of black individuals he had examined. *Id.* at 435–36. He also confirmed that hairs can vary on an individual, based on location, weather, and other "outside forces." *Id.* at 437–39. He disclaimed knowledge of "what percentage of the Negro race would have" all of the same characteristics, and clarified that "microscopic hair comparisons do not constitute a basis of positive personal identification." *Id.* at 450–51.

He acknowledged on cross-examination that he had used "two and possibly three assistants in[] this case," *id.* at 442, but also that his opinion came from work done "wholly by [him]," *id.* at 444–45. When asked about specific hairs that he deemed "inconclusive," he testified that he had not taken any notes about them because such notes on those hairs were not "necessary," and that he "ha[d] no specific recall" about those hairs. *Id.* at 445–48. At the end of cross-examination, Agent Neill stated that "the questioned hairs either originated from the [defendant] or from some other person of the same race whose [hairs] exhibit the same identical microscopic characteristics." *Id.* at 450–51.

On redirect, Agent Neill stated that he could not recall "ever having seen this many characteristics just matched up at random," and emphasized that in only "10 or 15" instances had he been unable two form an opinion about two hairs, and that these cases "involved [] either 10 or 12 characteristics, not this many." *Id.* at 452–53. He also testified that, on further reflection he had not "really thought about" the "seventeen characteristics" figure he gave and then further explained that "everyone has a cuticle" and "certain sub-structures present" and "the same could be said about the medulla," but the individual features of the hair "lend[] the uniqueness to a particular group of hairs to an individual [sic]." *Id.* at 458.

## (b)    Fingerprint Expert Testimony

D.C. Metropolitan Police Department ("MPD") Officer Joseph Mullinax testified about fingerprint evidence found at the crime scene.  Trial Tr. 8/23/72 at 486.[6]  He testified to the widespread scientific acceptance of fingerprinting and that "no two fingerprints of different individuals have ever been found to be alike," including "identical twins."  *Id.* at 489.  He then testified that of the fingerprints taken from the crime scene, including the kitchen and windowsill, only one fingerprint was suitable for comparison purposes, a thumbprint from a doorway in the victim's apartment.  *Id.* at 491–92.  This print was "the right thumb impression of [the defendant]."  *Id.* at 492.  He testified that there was "no doubt in [his] mind" that the print belonged to the defendant.  *Id.*  On a brief cross-examination, Agent Mullinax confirmed that if a fingerprint is left undisturbed, it can remain there "indefinitely."  *Id.* at 493.

## (c)    Gas Chromatographic Analysis of Oil Evidence

Special Agent Kenneth Nimmich testified that he performed "gas chromatographic analysis" of the oil found in the vial taken from the defendant in New York City and compared it with the vial found under the window that Hinson identified as "Jasmine" oil, he "found them to be similar" and they "matched" in the relevant outputs from the analysis.  *Id.* at 551–52.

## (d)    Firearms Evidence

The government called two witnesses to testify about the victim's fatal gunshot wound and the gun that was likely responsible for it.

---

[6]    Prior to Officer Mullinax's testimony, two officers briefly testified about the process by which fingerprints were collected at the crime scene and from the defendant, Trial Tr. 8/22/72 at 460 (testimony of Sergeant Walter Capps), *id.* at 472 (testimony of Officer Alfred Walton).

FBI Special Agent Cortlandt Cunningham specialized in "firearms identification." *Id.* at 572–73. He reviewed the "slug found by the body of the deceased" for caliber and rifling impressions. *Id.* at 574. "Rifling impressions," he explained, are "nothing more than the number of grooves in the barrel [of a gun], the width of those grooves, and the direction of the twists of the rifle." *Id.* at 575. He testified that the bullet found at the crime scene was "a .38 caliber metal point bullet which [was] fired from a [gun with a] barrel having five grooves, right-hand twist." *Id* at 575. He "found that [the defendant's] revolver produces rifling impressions such as those" found on the bullet at the crime scene, with "five grooves, right-hand twist." *Id.* He further testified that the gun recovered from the defendant in New York City was loaded with "the same type bullet[s]" as the one that killed the victim, and that the defendant's gun was "a .357 Magnum caliber, which is a .38 caliber weapon," and was "the most powerful .38 caliber revolver . . . commercially manufactured" at that time. *Id.* at 576–79. He cautioned, however, that due to "the extreme mutilation of the bullet," he was unable to make a definite match. *Id.* at 575. Officer Cunningham was not cross-examined.

Doctor James Luke, the "Chief Medical Examiner of the District of Columbia," had examined the victim's body at the crime scene and performed a "full autopsy" the next day. *Id.* at 579–83. Doctor Luke testified that at the crime scene, he observed "a large caliber contact bullet wound of the back portion of the deceased's head," and found a bullet in "the hair within the matted blood within the right side of [the victim's] head." *Id.* at 585. At the full autopsy the next day, Doctor Luke confirmed that "[the victim's] cause of death was [a] bullet wound of the head and brain." *Id*. at 583–86. The victim had been shot "directly behind the mid-portion of

the left ear" and the wound suggested that the gun was in direct contact with the skin of the victim when it was fired. *Id.* at 586–87. Based on the features of the wound, Doctor Luke concluded that the bullet was fired by "a large caliber weapon [] with a very high velocity." *Id.* at 588. Upon being prompted by the government, he concluded that the bullet could have been fired by "a .357 magnum" and could not have been fired by a ".22," a ".32," or "a [regular] .38 caliber bullet." *Id.* at 593. He also opined that a number of injuries to the victim's face and body had not been caused by the bullet but by recent trauma, and that he found "large numbers of intact sperm" in the victim's vagina. *Id.* at 589–90.[7]

On cross-examination, Doctor Luke testified that the bullet would could have also been caused by "a rifle" or "a .45" in addition to a .357 Magnum, but stated that he did not "know any more" types of guns that could be a match. *Id.* at 594. Based on the characteristics of a contusion on the victim's chin, he opined that she could have "been rendered unconscious" by the physical trauma that she suffered. *Id.* at 596–97. As to the crime scene, he testified that the stockings around her wrist and neck were "twisted," not tied, and that her wounds would not have impeded her ability to yell. *Id.* at 600. He testified that the sheets used to "remove th[e] body" were "laundered and delivered [] folded" to the Department, and acknowledged that one of his "helpers" in performing the autopsy was black and did not wear protective gear over his hair during the autopsy. *Id.* at 604–07.

<em>vi.    The Defendant's Arrest in New York City</em>

The defendant was arrested in New York City three days after the murder. The government called the manager of the hotel where the defendant was arrested, the New York

---

[7]        Special Agent Alvin Hodge of the FBI briefly testified that the green towel found at the crime scene had tested positive for the presence of "male reproductive cell[s] or spermatozoa," though he did not testify as to whether the semen was linked to any particular individual. *Id.* at 558–60.

City police officer who arrested the defendant, and the D.C. MPD officer who subsequently

traveled to New York to arrest the defendant on a warrant.

(a)    <em>Thomas Testaverde</em>

Thomas Testaverde, "the manager" of the Greenwich Hotel in New York City, testified

about the defendant's arrest in the hotel on December 17, 1971. *Id.* at 495–59. At around "six

o'clock" that evening, Testaverde received a report of a disruptive guest and so he went up to

"the sixth floor of the hotel" where he found the defendant complaining, to no one in particular,

that "people were bothering him" and that "someone had thrown a can of piss under his door."

*Id.* at 498–99. The defendant threatened that his unidentified antagonizers "don't know who they

are messing with" and that "they were bothering the wrong person, because he would give them

a little of this .357 he had." *Id.* At this point, the defendant "opened his coat, and [] had what

appeared to be a .357 Magnum strapped to his chest." *Id.* at 500. Testaverde then identified

himself as the manager of the hotel and got the defendant a new room, after which Testaverde

"went back downstairs to [his] office" and called the police, who arrived "about five minutes

after" the call was made. *Id.* at 502–03.

On cross-examination, Testaverde testified that the defendant had checked in during "the

midnight shift" between December 16 and December 17. *Id.* at 504. The defendant was "in a

lower excited state" during their encounter and "was talking at an above average tone of voice,

but [] was just making declarations." *Id.* at 506. Testaverde confirmed that the defendant

calmed down after he identified himself as the hotel manager, *id.* at 508, and observed that the

defendant "just seemed to be very quiet" after that point, *id.* at 510. In response to defense

counsel's questions about the Greenwich Hotel itself, Testaverde described it as "a place where

you can get clean sheets for about three dollars a night," and the kind of place where "people

don't ask for proof" of who is checking into the hotel. *Id.* at 514–15, 518–19.

*(b)     Officer William Burns*

New York City Police Officer William Burns testified about his arrest of the defendant at the Greenwich Hotel. *Id.* at 521–22. Upon arrival at the hotel, Officer Burns along with an unnamed officer were taken to the defendant's new room, where Testaverde had moved him after their encounter. *Id.* at 526–27. The officers knocked on the door of the room, and when the defendant came out "two minutes" later, he was identified by hotel staff. *Id.* at 527–529. The officers arrested him and recovered "a Smith and Wesson .357 Magnum" from a "holster on a belt" on his person. *Id.* Officer Burns found that the gun contained "four live cartridges [] and two spent cartridges." *Id.* at 529. The officers also found a "vial of perfume . . . on [the defendant's] person." *Id.* at 540. Officer Burns was not cross-examined.

*(c)     Officer Otis Fickling*

D.C. MPD Officer Otis Fickling briefly testified about going to arrest the defendant on an outstanding arrest warrant "for first degree murder." *Id.* at 542–44. At that time, Officer Fickling took custody of the defendant's belongings, including the defendant's gun. *Id.* at 546. He also testified that he had been present when the victim's neighbor, Dorothy Rager, had identified the defendant's picture from a photographic array presented to her on February 17, 1972, and corroborated her testimony that she "immediately" identified the defendant's picture. *Id.* at 544–45. Officer Fickling was not cross-examined.

**3.     Closing Arguments**

At the close of the government's evidence, defense counsel moved for an acquittal, arguing that "the Government's evidence is void of any identification of th[e] defendant at the scene of the crime on the date or at the time of the crime . . . ." *Id.* at 637. Defense counsel, in particular, pointed out that "[t]he hairs" did not "tie [the defendant]" to the crime scene because they "tie[d] in all Negro males with hair characteristics of this nature" and thus did not "to the

exclusion of all other persons identify him." *Id.* at 639. He further the sufficiency of evidence to find that the defendant guilty of premeditation, and emphasized above all that the government had presented "a totally circumstantial case." *Id.* at 641–43.

The government countered by pointing out, *inter alia*, that the case "would have been sufficient to go to the jury after the testimony of the seller of the[] perfumes," given the overwhelming evidence provided by that testimony alone. *Id.* at 645. The prosecutor also cited the witnesses who saw the defendant loitering outside the victim's apartment on two different days in the week before the murder, the expert gun evidence, which strongly supported the conclusion that the defendant's gun was the murder weapon, and "add[ed] to that . . . the fingerprint," and "the hair testimony." *Id.* at 645–47. Regarding the hair analysis, the prosecutor stated that Agent Neill "ha[d] never, in his [] eight years of comparing," had so many characteristics match, and though he acknowledged that the hair evidence could have come from "another Negro male," he asserted that the testimony "almost" provided "a positive identification." *Id.* at 647.

Noting that the government had a "strong circumstantial case," the Court denied the motion for acquittal, but reserved ruling on the "charg[e of] first degree murder," until the following day, *id.* at 650–51. The next morning, the Court granted the motion for acquittal with respect to the first degree murder charge. Trial Tr. 8/24/72 at 656.

After the defendant confirmed to the Court that he did not wish to testify, the parties made their closing arguments.

### i.  *Prosecutor's Summation*

The prosecutor's closing argument reviewed, "in chronological order," the government's case "based on the evidence" at trial, *id.* at 671, beginning with the break-in on December 9, 1971, at the victim's neighbor Susan Shook's apartment, and the second break-in at the same

apartment "the following morning" on December 10, 1971. *Id*. at 671–73. The prosecutor

highlighted that a building employee "came up" after Shook called about the second break-in,

and, on his way, saw a "guy dressed in [] Moroccan robes and . . . wearing a fez" coming from

the direction of Shook's apartment. *Id*. at 673. The prosecutor likewise reminded the jury that

another neighbor, Dorothy Rager, had provided a "positive[] identifi[cation]" of the defendant

after seeing him on two separate days outside the victim's apartment, both times at "about 5:30."

*Id.*

The prosecutor next reminded the jury that the victim's boyfriend had testified that the

victim "hadn't been staying in her apartment for a couple weeks." *Id*. at 674. When she came

home for the first time in a few weeks, the defendant was already in the apartment, and seeing

her alone, "attack[ed] her." *Id*. When the victim was attacked, she let out a "blood-curdling

scream," which was the scream heard by her other neighbor, Grace Pyles, around 5:45 P.M. *Id*.

at 674. After the victim fought back, the defendant "started to hit her," knocked her briefly

unconscious, likely with the blow identified in "the testimony of the coroner," and the defendant

then raped the victim. *Id*. at 676. According to the prosecutor, during this time, the victim's

boyfriend knocked on the apartment door, and heard a scream followed by a gunshot, which was

the victim fighting against her attacker and the defendant pressing the gun "right up to the left

side of her head," and shooting her point-blank in her temple. *Id*. at 676–77. The defendant then

fled out of a bedroom window, during which time he dropped in the bedroom two vials of oil he

had purchased from the "perfumer" in the bedroom, and after lowering himself out of the

window, he fell to the ground, dropped "his other three vials of perfume," and fled. *Id*. at 678.

The prosecutor then turned to the defendant's trip to New York City, citing the testimony

of the hotel manager that the defendant was "angry" and, when confronted, "put[] aside his

jacket and [showed] his .357." *Id.* at 679.  The prosecutor highlighted the "[f]ive vials of perfume [] found at" the crime scene, one vial of which the vendor Artis Hinson had only sold a single time, to the defendant.  *Id.* at 679–80.  Hinson had labelled the vials himself and had given the defendant a receipt, which included the names of the oils found at the crime scene.  *Id.* at 680–81.  A week later, the defendant returned to the store "on a Wednesday," the day after the murder, and bought two more vials of oil, which was unusual in Hinson's experience.  *Id.* at 682.  After being asked why he was making another purchase so quickly, the defendant told Hinson that he "lost [his other purchases] going through a window."  *Id.*  At this point, the prosecution stated that he "could []have rested [his] case right there," and that he was "boring [the jury] with anything further."  *Id.* at 682.  He reemphasized: "Is that not enough to convict this defendant?" *Id.*

The prosecutor next reviewed the hair evidence.  *Id.* at 682–84.  Noting that Agent Neill had "said about five percent of people would have" the two "unusual" characteristics found in the defendant's hair, and "in the course of 35,000 to 40,000 microscopic analyses," Agent Neill had "never seen the hairs from two different individuals, known individuals, to be microscopically alike" when comparing nineteen characteristics.  *Id.* at 684.  The prosecutor emphasized the positive fingerprint match found in the victim's apartment and turned to a longer discussion of the defendant's gun.  *Id.* at 685.  The prosecutor reminded the jury that the gun found on the defendant contained "four live rounds and two expended casings," and that a witness has testified that the metal-tipped bullet that killed the victim was "similar to" those bullets.  *Id.* at 685.  The prosecutor focused on the "five grooves, right twist" found in the defendant's gun that were consistent with the "rifling characteristics" on the bullet from the crime scene.  *Id.*  He further pointed out that "the coroner" had "said that there is no way" a ".22

or .32 [could] have" been the murder weapon, and likewise "said an ordinary .38 wouldn't do it," but "a .357 would do it," making the alignment of ".38 caliber [bullets] in a .357 cartridge" a strong indication that the defendant's gun "with [its] four live rounds and two expended rounds[, was] the murder weapon." *Id.* at 686–87.

ii.  *Defense Summation*

Defense counsel's summation was brief, *id.* at 700–09, and at 9 pages, less than half the length of the prosecutor's 20-page summary of the evidence, *see id.* at 667–87. Defense counsel suggested that the evidence only proved that the defendant had been in the victim's apartment at some time, not necessarily on the day of the murder, *id.* at 702, since "the fingerprint" and "the perfume" could have been left in the apartment at any time, *id.* at 702–703. While the defendant was seen in the building on December 9 and 10, 1971, defense counsel stressed that the government failed to produce any witnesses to testify that "they saw some[one] fitting [the defendant's] description" in the building on the day of the murder. *Id.* at 703. He argued that this was particularly remarkable given the defendant's noticeable manner of dress. *Id.* at 706.

Defense counsel otherwise ignored the forensic gun evidence and the oil vial evidence and focused instead on the weakness of Agent Neill's hair testimony, arguing that the answers to questions on cross-examination "did not fit" the answers Agent Neill had given on direct examination. *Id.* at 703–704. He argued that Agent Neill had been unable to "talk about the[] characteristics" on cross-examination other than giving "the same rote answers that he gave [] on direct examination," and even "on simple questions" that "required a simple yes or no," Agent Neill "gave a speech." *Id.* at 704. He finally emphasized that the chance of a false match "is not known" and summarized the message of Agent Neill's testimony as being "90 percent of Negro hair looks to him to be the same." *Id.* at 705. Defense counsel concluded by stressing the

importance of the "reasonable doubt standard," and asking the jury not "to eulogize [the victim]" by convicting the defendant. *Id.* at 706–09.

### iii.    Prosecutor's Rebuttal Summation

The prosecution's rebuttal was short at four transcript pages. *See id.* at 710–13. The prosecutor addressed the hair evidence, arguing that while "Agent Neill said . . . these hairs could have originated from the defendant or another Negro male," the rarity of the defendant's hair characteristics "amounts to a positive means [of identification] here." *Id.* at 710. He stressed that Agent Neill compared "19 characteristics in every one of th[e] hairs that he found," and the matches on all of those characteristics. *Id.* at 711. He then moved on to address the powerful nature of the other evidence in the case. He reminded the jury of the fingerprint, the "perfume" evidence and testimony, including the defendant's statement that he lost his oil vials "going out a window," and the ".357 Magnum [found] in its holster" when the defendant was arrested in New York City. *Id.* at 711–12. He urged the jury to "add it all up" and not focus on "one thing," but to note that the evidence all "points in one direction, to the defendant and nobody else." *Id.* at 712.

### 4. Jury Deliberations and Verdict

The judge instructed the jury on the remaining counts against the defendant: felony murder, rape while armed, and burglary while armed, as well as the two included lesser counts of counts of rape and burglary. *Id.* at 714–751. An hour and a half later, the jury returned a verdict of guilty on the felony murder and rape while armed charges and a verdict of not guilty of burglary while armed or burglary. *Id.* at 754–55.

### B.  THE INSANITY HEARING, OTHER TRIAL, AND APPEAL

Before sentencing, the Court *sua sponte* raised the issue of whether the defendant was legally insane at the time he committed the rape and murder of Deborah Noel, which issue was

objected to by the defendant himself, though not by defense counsel.  *Ausby* slip op. at 2 (noting that the defendant personally objected to the Court raising the insanity defense).  A week after the guilty verdict, the same trial jury heard one day of evidence as to whether the defendant "was insane . . .at the time of the offenses [he] committed."  Trial Tr. 8/29/72 at 789.  The next day, the jury heard closing argument from both sides, and reached the verdict that the defendant was "[g]uilty of the offense of felony murder as previously decided," and "guilty of the offense of carnal knowledge while armed as previously decided," rejecting any claim that the defendant was guilty by reason of insanity.  Trial Tr. 8/30/72 at 984–85.  After his insanity trial, the Court again deferred sentencing until after the resolution of the other two charges pending against the defendant for the murders of two additional women, Sharon Tapp and Sherry Frahm.

In January 1973, the defendant was tried in a four day trial for the counts that had been severed from the original indictment relating to the murders of two other women who lived in the same neighborhood as the victim.  *See* Trial Trs. 1/2/73–1/5/73.  The jury found the defendant guilty of second degree murder of both women.  Trial Tr. 1/5/73 at 351; *see also* Gov't's Opp'n at 2 n.2 ("Later, in January 1973, the defendant was convicted . . . of murdering Sharon Tapp and Sherry Frahm in their apartment located 2714 Quarry Road, N.W. in the District of Columbia, the same neighborhood where the Noel murder took place.").  The defendant was sentenced to life imprisonment for the murder of Deborah Noel, ten to thirty years' imprisonment for the rape of Deborah Noel, and ten to thirty years for the murder of Sharon Tapp and Sherry Frahm, all to be served concurrently.  Sentencing Hr'g Tr. 1/15/73; *see also Ausby*, 489 F.2d 1273, at *2 (unpublished op.).[8]

---

[8]     The defendant's concurrent sentences of 10 to 30 years' for the rape of Deborah Noel, and for the rapes and murders of Sharon Tapp and Sherry Frahm have been served, and he remains incarcerated on his life sentence for the felony murder of Deborah Noel, which is the sentence challenged in the instant suit.

The defendant appealed his sentence on the ground that the trial court unconstitutionally "plac[e]d upon [the] defendant the burden of proving his insanity defense by a preponderance of the evidence," which the D.C. Circuit summarily rejected in a published order accompanied by a two-page unpublished memorandum opinion. *Ausby*, 489 F.2d 1273.

## C. DEVELOPMENTS CONCERNING COMPARATIVE HAIR ANALYSIS IN COURTS

Following "allegations of improper practices by certain [FBI] examiners," DOJ established a task force to evaluate, among other things, the use of hair evidence in criminal trials. Pet'r's Mem. Supp. Pet'r's Mot. ("Pet'r's Mem.") Ex. A at 1–2 (Letter, dated September 22, 2015, from Vincent H. Cohen, Jr., Acting United States Attorney for the District of Columbia to Sandra Levick, Public Defender Service (the "Cohen Letter")), ECF No 2-1. The task force uncovered evidence confirming some examiners' use of these "improper practices," *id.* at 1, prompting the Congress to task the National Research Council, whose work involves "furthering knowledge and advising the federal government" on issues of science, Comm. on Identifying the Needs of the Forensic Science Cmty., Nat'l Research Council, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD ("Strengthening Forensic Science") (2009) at 3 (available at https://www.ncjrs.gov/pdffiles1/nij/grants/ 228091.pdf), with "examining ways to improve the quality of forensic sciences," Brandon L. Garret & Peter J. Neufeld, INVALID FORENSIC SCIENCE TESTIMONY AND WRONGFUL CONVICTIONS, 95 Va. L. Rev. 1, 7 (2009). In 2009, the Council issued a report concluding that "[f]orensic science research is not well supported," STRENGTHENING FORENSIC SCIENCE at 15, and, as relevant to this case, that "[n]o scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population," *id.* at 160. The study recognized that previous studies of hair comparison analysis have "been shown to be unreliable," and the committee "found no

scientific support for the use of hair comparisons for individualization in the absence of" DNA testing. *Id.* at 158–61.

Subsequent to the publication of this report, and "after the exonerations of several individuals whose convictions had rested in part on the introduction at trial of faulty hair comparison analysis or testimony, . . . the FBI, in coordination with the [DOJ], initiated a comprehensive review of microscopic hair comparison analysis or testimony" provided in over 20,000 cases that were litigated before December 31, 1999. Cohen Letter at 1–2. The purpose of this review was "to ensure that analysis or testimony by FBI Lab personnel regarding hair comparison properly reflected the bounds of science, and that no person was deprived of a fair trial based on flawed analysis or testimony." *Id.* at 2.[9] As of September 2015, this review identified 3,118 cases that rested at least in part on "positive associations between hair evidence and a known sample." Pet'r's Mem. Ex. C at 1 (Letter, dated September 15, 2015, from Peter J. Kadzik, Assistant Attorney General to Richard Blumenthal, United States Senator (the "Kadzik Letter"), ECF No. 2-1. The specific types of errors identified included an FBI examiner testifying that hair comparison analysis can identify "a specific individual to the exclusion of all others," which "exceeds the limits of the science"; an FBI examiner assigning some sort of statistical weight or likelihood of a match between hair samples "that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association"; and an FBI examiner using the number of times he or she had been unable to make a match in previous cases "to bolster the conclusion that a hair belongs to a specific individual." Pet'r's Mem. Ex D

---

[9] At around the same time, the U.S. Attorney's Office for the District of Columbia also "began its own review of cases prosecuted to conviction in the District of Columbia Superior Court that involved an analyst's report of, or the introduction of testimony regarding, a positive hair association." *Id.*

at 1 ("Microscopic Hair Comparison Analysis," Department of Justice, dated November 9, 2012), ECF No. 2-1.

Based on these reviews, the DOJ and FBI "have formally acknowledged that nearly every examiner in [the] elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence [about hair matches] against criminal defendants over more than a two-decade period." *Gimenez v. Ochoa*, 821 F.3d 1136, 1144 n.4 (9th Cir. 2016) (quoting Spencer S. Hsu, FBI ADMITS FLAWS IN HAIR ANALYSIS OVER DECADES, Wash. Post (Apr. 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html?tid=a_in) (second alteration in original). Given this finding, the United States has decided that, in cases challenging convictions based on the improper use of forensic hair evidence, "in the interest of justice, the government is waiving reliance on the statute of limitations for collateral attack on any legal claims arising from erroneous statements in laboratory reports or testimony. Kadzik Letter at 2. Additionally, "the government will not dispute that [any identified] erroneous statements [about hair evidence] should be treated as false evidence and that knowledge of the falsity should be imputed to the prosecution." *Id.*

### D.  THE DEFENDANT'S PENDING § 2255 MOTION

In September 2015, "the United States Attorney's Office for the District of Columbia notified [the defendant], through counsel, that the government had reviewed [his] case," and concluded that some form of false hair evidence was presented during his criminal trial. Def.'s Mem. Ex. B (Letter, dated September 11, 2015 from Norman Wong, Special Counsel, to Vincent Cohen, Jr., Acting United States Attorney for the District of Columbia) at 2, 7, ECF No. 2-1. In this letter, the government confirmed that it would "not dispute that [hair evidence] should be treated as false evidence and that knowledge of the falsity should be imputed to the prosecution."

*Id.*; *see also* Gov't's Opp'n at 14 n.11 ("[T]he government . . . will not contest that the erroneous evidence was false or misleading or that the government as a whole should have known that it was false or misleading."). After receiving this letter, and in light of the government's concession, the defendant filed the instant motion to vacate his conviction and for a new trial under 28 U.S.C. §2255, which motion is now ripe for review.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." *Id.; see also United States v. Farley*, 72 F.3d 158, 162 (D.C. Cir. 1995) (a federal conviction "may be set aside *only* on direct appeal or *via* a section 2255 motion" (emphasis in original) (citing FED. R. CRIM. P. 32(d)). This statute "replaced traditional habeas corpus for federal prisoners (at least in the first instance) with a process that allowed the prisoner to file a motion with the sentencing court" challenging his sentence "to make postconviction proceedings more efficient" by "direct[ing] claims not to the court that had territorial jurisdiction over the place of the petitioner's confinement but to the sentencing court, a court already familiar with the facts of the case." *Boumediene v. Bush*, 553 U.S. 723, 774–775 (2008). "If the court finds that . . . there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

While a judgment "cannot be lightly set aside by collateral attack, even on habeas corpus," *McNair v. United States*, 235 F.2d 856, 858–859 (D.C. Cir. 1956) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 468–69 (1938)), the Supreme Court has long held that the prosecutor's

knowing use of false evidence or perjured testimony constitutes a denial of the defendant's due process right to a fair trial and may warrant reversal of the conviction. *See, e.g., Giglio v. United States,* 405 U.S. 150, 155 (1972) (finding that "the due process requirements enunciated in *Napue,*" as well as "other cases . . . require a new trial" where a key witness falsely testified at trial, without correction, about the government's promise not to prosecute him if he testified before the grand jury and at trial); *Napue v. Illinois,* 360 U.S. 264, 265–70 (1959) (holding that in murder prosecution with no reliable eyewitnesses, failure of the prosecutor to correct the false testimony of "the principal witness for the State" regarding the promise of a recommended reduced sentence in return for his testimony, denied petitioner due process of law in violation of the Fourteenth Amendment); *Mooney v. Holohan,* 294 U.S. 103, 112–113 (1935) *(per curiam)* (holding that conviction obtained "through a deliberate deception of court and jury by the presentation of testimony known to be perjured" is "inconsistent with the rudimentary demands of justice" and may constitute a violation of the Fourteenth Amendment); *accord Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) ("Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice . . . have we imposed a constraint tied to the Due Process Clause.") (internal quotations and citation omitted). The Supreme Court has also spoken eloquently to the policy underpinnings of this constitutional rule, citing "the special role played by the American prosecutor in the search for truth in criminal trials" and the fact that "the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The same constitutional value of promoting fair trials that animated the Supreme Court's decisions in *Mooney*, *Napue* and *Giglio* involving the government's knowing use of false evidence at trial also undergirds the holding in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny, "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See id.* (noting that the "principle of *Mooney* [] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused," and "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair"). Thus, claims that the prosecution knowingly used false evidence are a subset of *Brady* claims. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (explaining that "[t]he rule of *Brady* [] arguably applies in three quite different situations" involving "the discovery, after trial of information which had been known to the prosecution but unknown to the defense," including, with citation to *Mooney*, "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.").

The D.C. Circuit has explained that "even if the prosecution either sponsored or failed to correct false testimony, the grant of a new trial is not automatic." *United States v. Vega*, 826 F.3d 514, 529 (D.C. Cir. 2016); *see also Strickler,* 527 U.S. at 281 (noting that "not every violation of [the prosecution's broad duty of disclosure] necessarily establishes that the outcome was unjust"); *Giglio v. United States*, 405 U.S. at 154 ("We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict," because "[a] finding of materiality of the evidence is required under *Brady*") (internal quotation marks and

citation omitted); *United States v. Straker*, 800 F.3d 570, 604 (D.C. Cir. 2015) (noting that "prosecutorial misbehavior alone does not a *Brady* violation make"). More must be shown to necessitate a new trial.

A due process violation arising from the government's knowing suppression of evidence only entitles a defendant to relief when "three components" are met: "[(1)] The [suppressed] evidence . . . must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [(3)] prejudice must have ensued." *Strickler,* 527 U.S. at 281–82; s*ee also United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017) (enumerating "three elements" to prove *Brady* violation, with "[t]hird, the movant must demonstrate prejudice"). "To satisfy the prejudice element, the evidence must be material." *Id.*; *see also Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (noting that, for claimed *Brady* violation, petitioners "are entitled to a new trial only if they 'establis[h] the prejudice necessary to satisfy the "materiality" inquiry.'" (quoting *Strickler*, 527 U.S. at 282) (alteration in original)).

As a type of *Brady* claim, a similar analysis applies when a defendant seeks vacatur of a conviction based on the government's knowing use of false evidence at trial. *See Straker*, 800 F.3d at 604. For such *Napue/Giglio* claims, the Supreme Court has articulated the materiality inquiry to be whether there is "any reasonable likelihood [the false testimony could] have affected the judgment of the jury." *Napue,* 360 U.S. at 271. *See also Agurs,* 427 U.S. at 103 (noting that "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal citations omitted); *Giglio v. United States*, 405 U.S. at 154 ("A new trial is required if 'the false

testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'"

(quoting *Napue*, *supra*, at 271) (ellipses in original)); *Vega*, 826 F.3d at 529 (stating that "if the

prosecution either sponsored or failed to correct false testimony . . . 'a reviewing court must

determine" whether "the false testimony could in any reasonable likelihood have affected the

judgment of the jury" (quoting *United States v. Burch*, 156 F.3d 1315, 1329 (D.C. Cir. 1998)

(quoting *Giglio*, 405 U.S. at 154)); *Straker*, 800 F.3d at 604 (same); *United States v. Gale*, 314 F.

3d 1, 4 (D.C. Cir. 2003) (same).[10]  As the Supreme Court recently explained in commenting on

the "any reasonable likelihood" standard, the defendant "need not show that he 'more likely than

not' would have been acquitted had the new evidence been admitted," *Wearry v. Cain*, 136 S. Ct.

---

[10]      By contrast to the materiality test applied to *Napue/Giglio* violations requiring "any reasonable likelihood" that the false evidence could have affected the judgment of the jury, the Supreme Court has expressed a slightly different materiality test for *Brady* violations involving suppressed exculpatory and impeachment evidence. Specifically, suppressed evidence "is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner*, 137 S. Ct. at 1893 (quoting *Cone v. Bell*, 556 U. S. 449, 469-70 (2009)).  Rather than "reasonable likelihood" or "reasonable probability," the defendant urges that the Court apply yet a third iteration of the materiality standard using the words "reasonable possibility," which the defendant characterizes as "simply another articulation of the same requirement . . . ." Def's Reply at 2.  As support for a "reasonable possibility" version of the materiality test, the defendant cites a footnote in the part of Justice Blackmun's opinion in *United States v. Bagley*, 473 U.S. 667, 679 n. 9 (1985), that failed to garner a majority and Justice Souter's concurring/dissenting opinion in *Strickle*r, 527 U.S. at 299.  *See* Def's Reply at 2.  In *Bagley* the Supreme Court found error in an automatic reversal of a conviction due to a *Brady* violation without analyzing the materiality of the suppressed evidence, 473 U.S. at 678, and, in a part of the opinion joined by only one other Justice, Justice Blackmun discussed application of the materiality standard in different situations, noting that "the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard," *id.* at 679 n. 9 (citing *Chapman v. California*, 386 U.S. 18, 87 (1967)).  This simply does not amount to the Supreme Court's endorsement of a "reasonable possibility" standard.  Likewise, in *Strickle*r, the majority of the Supreme Court expressly rejected "reasonable possibility" as the correct materiality standard for Brady violations, finding "surely correct" a district court's determination that the defendant had met a "reasonable *possibility*" standard but that "petitioner's burden is to establish a reasonable *probability* of a different result," leading to denial of the petition for failure to "show materiality under *Brady* . . . ." *Strickler*, 527 U.S. at 296 (emphasis in original).  Nevertheless, in his concurring/dissenting part of the opinion, Justice Souter stated, "We have treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus have equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt."  *Id.* at 29.  He expressed the view that the difference between reasonable "possibility," "likelihood" or "probability" "are slight" but nonetheless "express distinct levels of confidence concerning the hypothetical effects of errors on decisionmakers' reasoning . . . ." *Id.*  The majority in *Strickler*, however, stuck to the "reasonable probability" standard in evaluating and rejecting the defendant's *Brady* claim.  *Id.* at 296 (holding that "petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed [and] therefore cannot show materiality under *Brady* or prejudice from his failure to raise the claim earlier.").  This Court is not persuaded that employing a different word, "possibility," makes the materiality standard any clearer in application than the standard formulation used in binding caselaw involving *Napue/Giglio* claims.

1002, 1006 (2016), or that "the undisclosed information may not have affected the jury's verdict," *id*. at n.6, but "only that the new evidence is sufficient to 'undermine confidence' in the verdict," *id*. (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))). This fact-specific materiality inquiry requires evaluation of the false evidence "in the context of the entire record." *Turner*, 137 S. Ct. at 1893 (quoting *Agur*s, 427 U.S. at 112); *see also Vega*, 826 F.3d at 531 (finding false testimony to be not material after "looking at the evidence in the record as a whole"); *United States v. Baxter*, 761 F.3d 17, 23–24 (D.C. Cir. 2014) (noting that even if suppressed evidence could have been used successfully for impeachment, "the probability of a different outcome depends on the context of all of the evidence offered at trial").

The defendant bears the burden of proving that false evidence presented at trial was material. *Straker*, 800 F.3d at 604 (holding "[the defendant] failed to demonstrate that the misleading content of the [] testimony" was material); *see also Alix v. Quarterman*, 309 F. App'x 875, 879 (5th Cir. 2009) ("[The defendant]'s assertion that the burden of proof rests with the prosecution to disprove his *Napue* allegations is contrary to clear precedent."). [11] This is consistent with the burden of proof generally applicable to a petitioner's § 2255 claim to establish a denial of constitutional rights. *See, e.g.*, *McNair v. United States*, 235 F.2d at 858; *United States v. Simpson,* 475 F.2d 934, 935 (D.C. Cir. 1973) (concluding that, in § 2255 action to set aside plea of guilty, "the preponderance of evidence supports the judgment rejecting

---

[11] The defendant suggests that for *Napue/Giglio* claims, "it makes no difference where the burden of persuasion lies" or, alternately, that the burden should be on the government, in accordance with "the original common law harmless-error rule [which] puts the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." Pet'r's Reply at 3 and n.2 (quoting *Chapman v. California*, 386 U.S. at 24). This suggestion simply ignores established law applied to *Napue* claims, as cited in the text, and, further, as the government correctly points out, "[a]lthough the Supreme Court in *Bagley* stated that 'the standard of review applicable to the knowing use of perjured testimony is *equivalent* to the *Chapman* harmless-error standard,' the Court did not discuss—and, accordingly, did not intend to modify—the allocation of the burden of proof in *Napue* cases." Gov't's Surreply at 2 n.2 (emphasis in original).

petitioner's claim"); *Grennett v. United States*, 403 F.2d 928, 930–931 (D.C. Cir. 1968) (finding

that petitioner in § 2255 action "has failed to prove by a preponderance of the evidence, as he is

obliged to do in a collateral proceeding," that his conviction should be set aside).

### III. DISCUSSION

The defendant contends that he is entitled to relief because there is a "reasonable

possibility . . . the government's knowing presentation" of Agent Neill's hair analysis testimony

"may have contributed to" the jury's decision to convict him. Pet'r's Mot. at 1, 4. He further

argues that the hair testimony was "powerful" and "crucial" evidence against him that was

"decisive on the issue of identifying the killer," Pet'r's Mem. at 26–27, and without the hair

testimony, the case against him was "entirely circumstantial," *id.* at 28, and did not clearly link

him to the crime scene on the day of the murder, *id.* at 25.

While conceding that the hair evidence "was false or misleading" and that "the

government as a whole should have known that it was false or misleading" at the time of the

trial, Gov't's Opp'n at 14–15 & n.11, the government disputes that the defendant is entitled to

relief. In the government's view, the defendant overstates the importance of the hair evidence to

his convictions, *id.* at 22–23, and contends that even absent the hair testimony, the prosecution

presented "compelling circumstantial case proving the defendant's guilt," *id.* at 17. Reviewing

collectively the evidence presented about the oil vials, the fingerprint, the gun and bullet

recovered from the crime scene, the various experts, and the witnesses who connected the

defendant to the victim's apartment, the government argues that the defendant's focus on the hair

evidence "ignores the other evidence of his guilt," *id.*, *see also id.* 18–20.

In light of the government's concession regarding the prosecution's knowing use of false

evidence at trial, the defendant has satisfied the first two elements to prove his *Napue*/*Giglio*

violation, leaving the parties to dispute only the third element of materiality: whether there is

"any reasonable likelihood" that Agent Neill's hair testimony could have had an impact on the outcome of the defendant's trial. *See* Pet'r's Mem. at 21 ("[T]he only salient issue in this case is whether the false evidence possibly influenced the jury to convict."); Gov't's Opp'n at 14 ("The government agrees."). In support of his motion, the defendant makes three main points, but none is persuasive.

First, the defendant argues that Agent Neill's testimony by itself entitles him to relief because it was "powerful evidence of [the defendant's] guilt." Pet'r's Mem. at 25. He asserts that Agent Neill represented his findings as being "as conclusive as a DNA match," and that Agent Neill's "status as an FBI expert" gave the jury "every reason to trust [him]." *Id.* at 25–28. According to the defendant, Agent Neill testified "he had *never*, in more than 35,000 hair examinations, matched two hairs known to be from different people," *id.* at 26 (emphasis in original), which the defendant interprets as "a false claim that hair was capable of providing individualized identification," *id.* The defendant further argues that the jury had no reason to doubt this seemingly "scientific" testimony because the government emphasized Agent Neill's status as "'one of the foremost hair analysts in the country from the FBI,'" *id.* at 26 (quoting Trial Tr. 8/22/72 at 682 (prosecutor's closing argument)), which had the effect of making his testimony "essentially unimpeachable," *id.* at 27.

The defendant is correct that Agent Neill presented his testimony as strongly supported by the scientific community and bolstered the weight of his testimony by citing his extensive experience as a hair examiner. Trial Tr. 8/22/72 at 379–83. He also implied that false matches between the hairs were highly improbable, both by stating that he had never had a false hair match when comparing nineteen characteristics across two hairs in his "30,000 to 35,000" cases, *id.* at 423–25, 452–53, and also by positing that two of the defendant's hair characteristics would

be found in "less than five percent" of black individuals' hair, based on the "10,000" hairs of black individuals he had previously analyzed, *id.* at 436. Yet Agent Neill also cautioned the jury that "microscopic hair comparisons do not constitute a basis of positive personal identification." *Id.* at 450–51. Moreover, his failure to keep any notes about hairs that the found did *not* match the defendant's hair undercut the overall impact of his testimony. *Id.* at 442–48.

In any event, the strength of Agent Neill's testimony, in isolation, is not the measure of the materiality of the defendant's false evidence claim. That measure is whether there is "any reasonable likelihood" of a different outcome if the jury had only been presented the *remaining* evidence in the case, without the false evidence. *Vega*, 826 F.3d at 529–30. This analysis requires evaluation of the remaining evidence without regard to the false testimony. Despite the substantial time that the defendant allocates in his briefing to the hair evidence presented at his trial, *see* Pet'r's Mem at 6–9, 15–20, 23–28, Pet'r's Reply Supp. Mot. Vacate ("Pet'r's Reply") at 4–11, ECF No. 8, the strength of the hair evidence is merely a sideshow in the materiality analysis, which instead must evaluate whether other evidence supports the defendant's conviction beyond a reasonable doubt such that confidence in the verdict is not undermined. *Vega*, 826 F.3d at 529–31.

Second, the defendant argues that the prosecutor heavily relied on Agent Neill's testimony "to devastating effect," Pet'r's Mem. at 32, which reliance demonstrates how important the prosecution believed the testimony was to the case, *id.* at 32–33 (quoting *United States v. Deloach*, 504 F.2d 185, 192 (D.C. Cir. 1974) (holding that the prosecution's view of its case is a "highly relevant measure" of whether evidence was prejudicial). He explains that the prosecution "made repeated references to Agent Neill's expert qualifications . . . emphasiz[ing] the most harmful—yet utterly false and misleading—parts of Neill's testimony," *id.* at 32–33,

specifically citing the prosecutor's statement in his rebuttal argument that Agent Neill's testimony "amount[ed] to a positive means [of identification]" *id.* at 33–34 (citing Trial Tr. 8/24/72 at 710–11 (alteration in brief)).

The defendant overstates the extent to which the prosecution relied on Agent Neill's testimony.  The prosecution only briefly discussed the hair evidence in its opening and closing arguments, devoting significantly more time to the gun and oil vial evidence, as well as the evidence of the multiple witnesses who observed the defendant not only in the victim's apartment building but outside her apartment in the week preceding the murder.  The prosecutor in fact remarked to the jury during closing argument that the oil evidence was "enough to convict the defendant" and stated that he was "boring [them] with anything further," Trial Tr. 8/24/72 at 682, an argument he also made to the Court in opposing the defendant's motion to acquit. Rather than a myopic focus on the hair testimony, as the defendant suggests, the prosecutor placed heavy and convincing reliance on other forensic evidence and witness testimony. It is the defendant's focus on the false evidence that fails to address the strength of the remaining evidence in the case.  *Vega*, 826 F.3d at 529–31.

Finally, the defendant argues that the hair evidence was "the one essential element of the government's case," *id.* at 29, and asserts that the other evidence against him "was entirely circumstantial and far from overwhelming on key points."  Pet'r's Mem. at 28.  According to the defendant, only the hair evidence "could connect [him] to the decedent's apartment at the time of her murder [] and conclusively point to [him] as her attacker," *id.* at 29, such that without the hair testimony, the evidence in the case merely provided a "positive association" between the defendant and the victim's apartment, *id.* at 32, and did not show that he was in the apartment "during the commission of the crime," *id.* at 28.

In support of this argument, the defendant explains how each piece of "'lawful' circumstantial evidence" can be individually reconciled with the defense theory that he broke into the victim's apartment on December 9 or 10, 1971, when he was seen in the building, and never returned. *Id.* at 29. First, he suggests that his fingerprint could have been left on a previous day when he broke into the victim's apartment, especially since she "was away from home." *Id.* at 30. He likewise asserts that "the vials [of oil] were lying in locations . . .indicating that they could have been dropped there a week earlier, while Ms. Noel was away from home." *Id.* at 30. Next, he quickly dismisses the gun evidence as only showing that he "could have" killed the victim with his .357 Magnum, and he likewise rejects any suggestion that his trip to New York City represented flight given that he purchased more oil in Washington, D.C. the day after the murder. *Id.* Finally, he discounts the three witnesses who saw the defendant wearing his "distinctive robe and fez" in the building in the week leading up to the murder because no witnesses testified to seeing him in the building on the day of the murder. *Id.* at 30. Based on these explanations for each individual piece of evidence, he argues that no evidence conclusively links him to the scene of the crime at the time of the murder and theorizes that "anyone from the public street" could have "entered the apartment . . . and attacked" the victim. *Id.* at 29–31.

This argument fails for at least two reasons. At the outset, the defendant's argument is incorrect. The hair testimony was *not* the only evidence linking the defendant to the victim on the day of the murder. Specifically, one of his oil vials was found at the crime scene *under* the victim's coat at the foot of the bed where she was halfway undressed, raped, and murdered, and another vial was found nearby under a nightstand, which was strong circumstantial evidence of the defendant's presence at the time of the murder. These vials were not found scattered about the apartment, only under and near the victim's body in the room where the victim was raped and

murdered. In light of the defendant's admission they day after the murder that he had lost some vials "going out a window," the three oil vials that were found on the ground below the victim's window also tie the defendant to the crime scene. Additionally, the fit between the defendant's gun and the profile of the possible murder weapon articulated by two expert witnesses provides yet another piece of evidence tying the defendant to the crime, not just to the victim's apartment at some unknown time prior to the murder.

Moreover, the defendant's parsing of each bit of evidence individually ignores the collective strength of the case against him. Reviewing the evidence as a whole, rather than piecemeal as the defendant has, makes a compelling case for the defendant's guilt. The defendant was seen by one of the victim's neighbors on two different days in the week leading up to the victim's murder, standing directly outside of the victim's apartment around 5:30 P.M., roughly the same time that the victim was murdered on December 14, 1971. The oil-soaked rag found in the apartment of the victim's neighbor after a break-in is strong evidence that the defendant broke into at least one apartment on December 9, and given that a building employee saw him walking away from that apartment soon after the neighbor called downstairs to report another break-in, there is strong evidence he broke into an apartment on December 10 as well. The oil vials, found at the foot of the bed where the victim was raped and murdered and on the nightstand next to the bed, and fingerprint found at the crime scene are such powerful evidence against him that the defendant must concede that he was in the victim's apartment, at some point. The oil vials found under the window of the victim's apartment are likewise inculpatory, as the defendant told Artis Hinson, the oil vendor, on the day after the murder that he had lost some oil vials "going through a window." The defendant's gun, which he showed no shyness in using to threaten others, was a .357 Magnum with a barrel that had "five grooves, right twist," and was

found loaded with four .38 caliber metal-tipped bullets and two empty casings, and the murder weapon was a high caliber gun, like a .357 Magnum, that had a barrel with "five grooves, right twist," and was loaded with .38 caliber metal-tipped bullets.

The Court need not decide whether each piece of evidence could, in isolation, support a guilty verdict because when taken together, the remaining evidence in this case overwhelmingly supports the defendant's guilt, and to suggest that the all of this evidence amounts to a series of coincidences ignores the plain reality of the totality of the evidence:  The false hair testimony did not make the government's case weaker, but given the overwhelming nature of the other evidence against him, there is no "reasonable likelihood" that the false hair testimony could have affected the jury's decision.  Even absent the false hair evidence, the government's proof of the defendant's guilt is overwhelming.

## IV. CONCLUSION

Forty five years ago, John Milton Ausby raped and murdered Deborah Noel, for which he was sentenced to life imprisonment.  During his trial, the government used false hair matching evidence against him, when the government should have known better.  The defendant is not entitled to relief, however, because given the overwhelming evidence against him, even absent the false hair matching testimony, there is no "reasonable likelihood" that the hair evidence "could have altered the outcome of the case."  *Vega*, 826 F.3d at 531.  The defendant's motion for a new trial under 28 U.S.C. § 2255 is denied.

An appropriate Order accompanies this Memorandum Opinion.

**Date**: August 16, 2017

_____
BERYL A. HOWELL
Chief Judge