| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 72-67 (BAH) |
| JOHN MILTON AUSBY, | Chief Judge Beryl A. Howell |
| Defendant. | |

## MEMORANDUM OPINION

The defendant, John Milton Ausby, faces retrial on one count of felony murder, for the murder of Deborah Noel on December 14, 1971, after the defendant's 1972 conviction on the same charge was vacated pursuant to 28 U.S.C. § 2255. *See United States v. Ausby*, 916 F.3d 1089 (D.C. Cir. 2019); Order (July 3, 2019), ECF No. 43. As retrial approaches, the parties now dispute whether the trial transcripts from the defendant's original trial in 1972 should be admitted as evidence. The government moves to admit the trial transcripts for twelve unavailable witnesses pursuant to Federal Rule of Evidence 804(b)(1). *See* Gov't's Mot. *in Limine* to Admit Prior Trial Testimony of Unavailable Witnesses and for the Court to Take Judicial Notice of Certain Records Related to the Prior Testimony ("Gov't's Mot."), ECF No. 79. Conversely, the defendant seeks to exclude these and any other transcripts, arguing in four separate, overlapping motions that the transcripts are inadmissible under Federal Rules of Evidence 804, 403, and 702. *See* Def.'s Mot. to Dismiss the Indictment as a Cure to Lingering Prejudice Caused by Gov't Misconduct and, in the Alternative, to Exclude Prior Transcripts as Substantive Evidence ("Def.'s Prejudice Mot."), ECF No. 42; Def.'s Mot. to Dismiss the Indictment or Exclude Transcripts for Violations of the Gov't's Duties Under Criminal Rule 16

and *Brady v. Maryland* ("Def.'s *Brady* Mot."), ECF No. 75; Def.'s Mot. to Exclude Fingerprint Testimony Under Federal Rules of Evidence 702 and 403 ("Def.'s Fingerprints Mot."), ECF No. 100; Def.'s Mot. to Exclude the Testimony of the Gov't's Proposed Expert Witness in Firearms Examination ("Def.'s Firearms Mot."), ECF No. 101.  For the reasons stated below, the government's motion to admit the trial transcripts is largely denied, and the defendant's motions are granted in part.

## I.     BACKGROUND

The full factual and procedural background for this case has been set out in prior decisions, *see United States v. Ausby*, 916 F.3d at 1090–92; *United States v. Ausby*, No. CR 72-67 (BAH), 2019 WL 2870232, at *1–3 (D.D.C. July 3, 2019); and *United States v. Ausby*, 275 F. Supp. 3d 7, 8–24 (D.D.C. 2017), *rev'd and remanded*, 916 F.3d at 1095, and thus only a brief review of the facts directly related to the pending motions is provided here.  The complex procedural history of the case is discussed first, followed by review of the original evidence at trial, the evidence available in 2019, and the trial transcripts at issue in the pending motions.

### A.     Procedural History

On December 14, 1971, Deborah Noel was raped and murdered in her apartment in Northwest Washington, D.C.  In 1972, the defendant was tried and convicted by a jury of one count of felony murder and one count of rape while armed, for the rape and murder of Noel. *Ausby*, 916 F.3d at 1091.  He was sentenced to life in prison for the felony murder conviction and 10 to 30 years, concurrently, for the rape while armed conviction.  *Id.*; *United States v. Ausby*, No. CR 72-67 (BAH), 2019 WL 2452988, at *1 (D.D.C. June 11, 2019).  At a separate trial, in 1973, the defendant was also convicted of murdering two other women, Sharon Tapp and Sherry Frahm.  For these additional convictions, the defendant received two 30-year sentences set to run concurrently with his sentence for the rape and murder of Noel.  *Ausby*, 2019 WL

2452988, at *1.  The defendant has been incarcerated for 47 years and, as of June 2019, remains on pre-trial detention pending retrial for the felony murder conviction as to Noel.  *Id.*

While the defendant was still incarcerated on the felony murder conviction, in 2015, following review of the defendant's case by the Department of Justice and the Federal Bureau of Investigation ("FBI"), the government concluded that "microscopic hair comparison analysis" used in the defendant's original trial "contained erroneous statements" and "exceeded the limits of science."  Def.'s Mot. to Vacate Conviction under 28 U.S.C. § 2255, Ex. B, Letter from Norman Wong to Vincent Cohen, Jr. (Sept. 11, 2015) ("Wong Ltr.") at 1, 2, ECF No. 2-1.  Eleven days later, on September 22, 2015, the government notified the defendant, *see* Def.'s Mot. to Vacate Conviction under 28 U.S.C. § 2255, Ex. A, Letter from Vincent H. Cohen, Jr. to Sandra Levick (Sept. 22, 2015) ("Cohen Ltr."), ECF No. 2-1, and "waived any statute of limitations and procedural-default defenses in the event [the defendant] sought relief under 28 U.S.C. § 2255," *Ausby*, 916 F.3d at 1092.

In 2016, the defendant filed a Motion to Vacate Conviction under 28 U.S.C. § 2255, arguing that "the government's knowing presentation of false and misleading expert hair examination testimony" violated the Due Process Clause of the Fifth Amendment and required vacatur of the defendant's conviction under the standard set out in *Napue v. Illinois*, 360 U.S. 264 (1959).  Def.'s Mot. to Vacate Conviction under 28 U.S.C. § 2255 ("Def.'s Mot. to Vacate") at 1, ECF No. 2.  The defendant's § 2255 motion was denied after this Court concluded that the "overwhelming evidence against him" left no "reasonable likelihood" that the outcome would have been different without the false hair evidence.  *Ausby*, 275 F. Supp. 3d at 32 (internal quotation marks and citation omitted).  Apart from the hair matching testimony, this evidence included: a fingerprint found in Noel's apartment, matched to a known fingerprint of the

defendant by a government expert, *id*. at 16–17; testimony from a forensic firearms expert concluding that the bullet used to kill Noel was compatible with the gun seized from the defendant upon his arrest in New York City three days after the murder, *id*. at 17; testimony from a neighbor who said she saw the defendant on the third floor of Noel's apartment building, near Noel's apartment, on both December 9 and 10, 1971, several days before the murder, *id*. at 13–14; and testimony from an importer and seller of scented oils, who said he sold to the defendant, on December 6, 1971, two vials of the same oil later found at the crime scene, *id*. at 13, and, further, that the defendant returned "[a]pproximately a week later" to purchase two more oil vials, because, as the defendant explained, he had "lost [his previous purchases] going through a window," *id*. (internal quotation marks omitted).

The D.C. Circuit reversed the denial of the defendant's § 2255 motion, finding that the forensic expert's false hair-matching testimony "could . . . have affected the judgment of the jury." *Ausby*, 916 F.3d at 1090 (alteration in original) (internal quotation marks omitted) (quoting *Napue*, 360 U.S. at 271). Upon finding a *Napue* violation, the D.C. Circuit ruled that this Court "should have granted [the defendant's] § 2255 motion to vacate his conviction," *id.* at 1095, and "remanded for proceedings consistent with [its] opinion" to afford appropriate relief, *id.*

Now, on remand, the government seeks to proceed with a new trial. *See* Hr'g Tr. (Apr. 12, 2019) at 3:14–15. Consequently, the parties were directed to file a joint proposed order to effectuate the D.C. Circuit's mandate. *See* Min. Order (June 7, 2019). The parties proposed vacatur of both the defendant's convictions for felony murder and rape while armed. *See* Jt. Filing: Proposed Order Vacating the Conviction, Att. 1 at 3, ECF No. 34-1. Upon consideration of the parties' proposal, the Court questioned *sua sponte* whether jurisdiction existed to vacate

4

the rape while armed conviction, since the defendant had already completed his sentence on that conviction at the time he filed his § 2255 motion. *See* Min. Order (June 17, 2019). While conceding that the jurisdictional question under § 2255 was "not without complexity," s*ee* Jt. Submission Regarding Def.'s Conviction for Rape at ¶ 2, ECF No. 40, the parties agreed that the rape conviction should be vacated, *id*. at ¶ 1, and alternatively proposed vacatur through a writ of *coram nobis*, s*ee id.* at ¶ 3; Def.'s Petition for Writ of Coram Nobis Vacating Conviction for Rape While Armed, ECF No. 41. After considering these additional filings, the Court vacated the defendant's felony murder conviction, but held that jurisdiction was lacking to vacate the rape while armed conviction under either 28 U.S.C. § 2255 or a writ of *coram nobis*, since the defendant had already served his sentence on that conviction and had failed to allege redressable, ongoing harm stemming from the rape conviction sufficient to meet the requirements of Article III standing. *Ausby*, 2019 WL 2870232, at *6, *8; *see also United States v. Ausby*, No CR 72-67 (BAH), 2019 WL 4737196, at *3–6 (D.D.C. Sept. 27, 2019) (denying defendant's Motion to Reconsider Denial of Vacatur of Rape Conviction, ECF No. 59). The defendant has since appealed this ruling. *See* Min. Order (Nov. 25, 2019) (granting certificate of appealability); Notice of Appeal, ECF No. 108.

The government then filed a new, 1-count indictment charging the defendant with felony murder predicated on rape. *See* Gov't's Notice of Filing of Indictment (Retyped) ("Indictment (Retyped)"), ECF No. 48. The defendant subsequently moved to dismiss the indictment on double-jeopardy grounds, arguing that the Double Jeopardy Clause of the Fifth Amendment barred retrial for felony murder predicated on rape since the defendant's 1972 conviction for the lesser-included offense of rape while armed had not been overturned. *See* Def.'s Mot. to Dismiss the Indictment as a Bar to Successive Prosecution Under the Due Process and Double Jeopardy

Clauses at 8–12, ECF No. 60. This motion was denied because the Double Jeopardy Clause does not bar retrial after the reversal of a conviction on appeal even when a related conviction for a lesser-included offense remains intact. *See United States v. Ausby*, No. CR 72-67 (BAH), 2019 WL 5102820, at *1–4 (D.D.C. Oct. 11, 2019). With the resolution of these legal questions about the scope of the charges to be retried, the parties have now turned to the evidence available and admissible at the retrial.

### B. Trial Evidence

At the defendant's original trial, in 1972, the government presented a range of evidence linking the defendant to the crime. *Ausby*, 275 F. Supp. 3d at 10–22. Aside from the forensic hair examiner, twenty-two witnesses testified for the government, including neighbors and employees in the building where Noel lived, the police officers who examined the crime scene and undertook forensic analysis of the evidence, and the medical examiner who performed the autopsy on Noel. *Id*. at 10, 10–19. In addition, the government relied on physical evidence, which included: the bullet used to kill Noel, a fingerprint found in her apartment, later matched to a known fingerprint of the defendant; vials of scented oil found in the apartment and similar vials from the same source in the possession of the defendant at the time of his arrest, as well as the testimony of the seller of those oil vials about the timing of those sales to the defendant both shortly before and after the murder; and a gun found in the defendant's possession at the time of his arrest, which a ballistics analyst determined could have been used to fire the bullet found at the crime scene. *Id*. at 8–9. The defense called no witnesses, and the defendant did not testify. *Id*. at 20.

Forty-seven years later, much of this original trial evidence is no longer available. Of the twenty-two witnesses other than the forensic hair examiner originally presented by the government, nine are no longer alive, Gov't Mem. Opp'n Def.'s Mot. Dismiss ("Gov't

Opp'n") at 36–38, ECF No. 56, one is too ill to testify, *id*. at 37, and the whereabouts of two others are unknown, Gov't's Mot. at 1, n.1.[1] The memories of the remaining ten government witnesses, meanwhile, "have faded or are gone completely." Gov't's Opp'n at 35. The government's fifty original trial exhibits, including all of the physical evidence in the case, have been lost or destroyed. Gov't's Opp'n at 4–6; *Ausby*, 275 F. Supp. 3d at 9 (explaining that the government's case files, "which presumably included reports, grand jury transcripts, witness statements, photographs and trial exhibits as well as all physical evidence recovered in this case no longer exist[]." (internal quotation marks omitted)). Thus, the primary evidence that remains, and that the government intends to introduce, is the transcripts of the 1972 trial.[2] Without the trial transcripts, the government does not have sufficient evidence to proceed to trial. *See* Hr'g Tr. (June 7, 2019) at 16:2; Gov't's Submission Regarding Necessity of 1972 Trial Transcripts, ECF No. 93.

The government moves to admit "the entirety of the transcripts" for twelve witnesses: three police officers (Donald Cherry, Otis Fickling, and Robert Laughery); three neighbors (Grace Thompson Pyles, Dorothy Rager, and Susan Shook); three expert witnesses (Cortland Cunningham, Alvin Hodge, and Joseph Mullinax); and two employees of the apartment complex where the Noel lived (George Elgy Crockett and Charles Wesley). Gov't's Mot. at 1.

---

[1] The government will not introduce testimony from Robert Neil, the microscopic hair analyst whose testimony was found to be unscientific. *See* Gov't's Opp'n at 4, n. 4.

[2] The government has made valiant efforts to find extant evidence in this case, including evidence for DNA testing, a form of forensic analysis unavailable at the time of the original trial. To this end, on July 22, 2019, the government learned that the D.C. Office of the Chief Medical Examiner had retained slides made from swabs taken from Noel's vaginal, oral, and rectal areas during her autopsy in 1971. *See* Gov't's Mot. for Order Requiring Def. to Submit to Saliva Samples/Buccal Swab and for Permission to Consume DNA Evidence, ECF No. 50. Soon afterward, the government sought to obtain a buccal swab DNA sample from the defendant and moved to consume the DNA evidence from the autopsy slides in order to conduct modern DNA testing. *Id*. This motion was granted, *see* Mem. Op. and Order (Aug. 7, 2019), ECF No. 62., but the government was ultimately not able to extract enough DNA from the 48-year-old autopsy slides to achieve interpretable results, *see* Status Report (Oct. 3, 2019) at 2, ECF No. 73; Status Rpt. (Oct. 30, 2019) at 1, ECF No. 97.
.

Conversely, the defendant moves to exclude these and any other trial transcripts that the government may seek to use to refresh the recollection of the remaining original trial witnesses called to testify. Def.'s Mem. Supp. Mot. Dismiss and Exclude ("Def.'s Prejudice Mem.") at 41–44, ECF No. 42-1; Def.'s *Brady* Mot; Def.'s Fingerprints Mot.; Def.'s Firearms Mot.

The final briefing on the five pending motions was submitted on December 13, 2019, *see* Gov't's Surreply to Def.'s Reply to Gov't's Opp. Mot. to Exclude Fingerprint Testimony ("Gov't's Fingerprints Surreply"), ECF No. 121, and the motions are now ripe for review.

## II. LEGAL STANDARD

The Supreme Court has recognized that "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see id.* at 40 n.2 (defining motion *in limine* "in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered"); *see also Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (noting inherent "power of a judge to hear a motion *in limine*"). Indeed, Rule 103(d) of the Federal Rules of Evidence mandates that the court must conduct a jury trial to the extent practicable so that inadmissible evidence is not suggested to the jury by any means. FED. R. EVID. 103(d). Pretrial motions *in limine* are an important mechanism to effectuate this goal of insulating the jury from inadmissible evidence and further the purpose of the rules, generally, to administer the proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102; *see Brodit v. Cambra*, 350 F.3d 985, 1004–05 (9th Cir. 2003) (noting that motions *in limine* "allow parties to resolve evidentiary disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a jury"); 21 Charles Alan Wright &

Kenneth W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5042, at 965 (2d ed. 2005) (noting that "the motion in limine . . . still remains a favorite method of the writers for satisfying Rule 103(c)"). Moreover, "[a] pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations." *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

## III.    DISCUSSION

The government contends that the prior testimony of twelve government witnesses who testified at the defendant's original trial in 1972 is admissible under Federal Rule of Evidence 804(b)(1) because each of the witnesses is either deceased or "unavailable" within the meaning of the rule, Gov't's Mot. at 1–2, and the defendant "had an opportunity to cross-examine" each witness during the original trial, *id*. at 2. The defendant counters that the prior trial testimony of these witnesses from the original trial should now be excluded for failure to meet the requirements of Rule 804(b)(1) and Rule 403, *see* Def.'s Prejudice Mem. at 30–44, and, as to expert testimony admitted during the original trial, Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Def.'s Fingerprints Mot.; Def.'s Firearms Mot. Thus, the parties' motions to admit and exclude the original trial transcripts turn on three evidentiary rules: Federal Rule of Evidence 804(b)(1), which governs the admissibility of prior testimony; Federal Rule of Evidence 403, which allows for the discretionary exclusion of unfairly prejudicial evidence; and Federal Rule of Evidence 702, which governs the admissibility of expert testimony. Each set of arguments will be examined in turn.

### A.    Admissibility of Prior Trial Testimony Under Fed. R. Evid. 804(b)(1)

The defendant argues that the trial transcripts are inadmissible under Federal Rule of Evidence 804(b)(1) for three reasons, each of which will be addressed separately. Def.'s Opp'n Gov't's Mot. ("Def.'s Opp'n") at 1, 3–6, ECF No. 87; Def.'s Reply to Gov't's Opp'n Def.'s Mot.

Dismiss ("Def.'s Reply") at 13–19, ECF No. 63; Def.'s Prejudice Mem. at 30–41. Rule 804(b)(1) establishes an exception to the general rule against the admission of hearsay, which "prohibits admission of certain statements made by a declarant other than while testifying at trial." *United States v. Salerno*, 505 U.S. 317, 320 (1992). In particular, Rule 804(b)(1) permits the admission of prior testimony given "at a trial, hearing, or lawful deposition" when two requirements are met. Fed. R. Evid. 804(b)(1)(A). First, the declarant must be "unavailable" to testify in person. *See* Fed. R. Evid. 804(a)(1)-(5). Second, the prior testimony must be "offered against a party who had … an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(B). Each requirement—unavailability, and an opportunity and similar motive for examination—is firm. *See Salerno*, 505 U.S. at 322 ("Nothing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements."); *see also Crawford v. Washington*, 541 U.S. 36, 68 (2004) (holding, with respect to testimonial evidence, that "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). To determine whether a party had the requisite opportunity and similar motive to develop given testimony, courts apply a "fact-specific inquiry." *United States v. Carson*, 455 F.3d 336, 379 (D.C. Cir. 2006); *Salerno*, 505 U.S. at 326 (Blackmun, concurring) (stating that the inquiry is "inherently a *factual inquiry*, depending in part on the similarity of the underlying issues and on the context…").

Here, the defendant argues, first, that the government's witnesses, even those who have died, are not "unavailable" within the meaning of the rule. Second, the defendant maintains that he had neither an "opportunity" nor a "similar motive" to cross-examine the government's witnesses at the original trial. Third, the defendant contends that no precedent exists for

admitting in bulk the prior testimony not just one or two but *twelve* witnesses in a single case, and that doing so runs contrary to the purpose of the rule. The defendant's 804(b)(1) arguments have force but are not ultimately persuasive.

### 1. *Unavailability*

For Rule 804(b) purposes, a witness "is considered unavailable only if the prosecution cannot procure her with good-faith, reasonable efforts." *United States v. Burden*, 934 F.3d 675, 686 (D.C. Cir. 2019). The government bears the burden of demonstrating that this requirement is met. S*ee Ohio v. Roberts*, 448 U.S. 56, 74–75 (1980), *abrogated in part on other grounds by Crawford*, 541 U.S. 36; *Burden*, 934 F. 3d at 686; *United States v. Lynch*, 499 F.2d 1011, 1022 (D.C. Cir. 1974). As a general matter, death establishes unavailability. *See Burden*, 934 F.3d at 686 ("'The law does not require the doing of a futile act' such as producing a witness who has died…") (quoting *Roberts*, 448 U.S. at 74)); *Mattox v. United States*, 156 U.S. 237, 242–43 (1895); *United States v. Tirado-Tirado*, 563 F.3d 117, 123 (5th Cir. 2009) ("if no possibility of procuring the witness exists (as, for example, the witness's intervening death), 'good faith' demands nothing of the prosecution.").

Here, eleven of the witnesses whose transcripts the government seeks to admit have died, are believed to have died, or cannot be located. Gov't Opp'n at 36–38.[3] One additional witness, the fingerprint analyst Joseph Mullinax, has a medical condition preventing him from traveling or testifying. *Id*. at 37. Nonetheless, the defendant argues that these witnesses are "not legally unavailable" even if they are "*physically* unavailable." Def.'s Opp'n at 3. The crux of this claim is the defendant's assertion that the government "caused the witnesses' absence,"

---

[3] The government has confirmed the deaths of seven witnesses (Donald Cherry, Cortland Cunningham, George Elgy Crockett, Otis Fickling, Alvin Hodge, Robert Laughery, and Grace Thompson Pyles), and believes that two others (Dorothy Rager and Susan Shook) have also died. Gov't Mot. at 36–38. Two additional witnesses, Alfred Walton and Charles Wesley, have not been located and have possibly died. *Id*. at 1, 1, n.1.

Def.'s Reply at 15, by "fail[ing] to profess their wrongdoing for forty years," citing this as "*the* reason nearly half of the witnesses are unavailable," *id*. (emphasis in original); *see also* Def.'s Opp'n at 3.  On this theory, the defendant maintains that even those witnesses who have died fail to qualify as unavailable within the meaning of Rule 804.

To be sure, the requirement of unavailability is not met when a party "procure[s] or wrongfully cause[s] the declarant's unavailability as a witness."  FED. R. EVID. 804(a).  Thus, when the government affirmatively removes a witness from the jurisdiction—by, for example, deporting the witness—the witness may not be considered unavailable if the government fails to take reasonably sufficient measures to provide for the witness's return.  *See Burden*, 934 F.3d at 689 (witness not "unavailable" when government "made no efforts before deporting [him] to secure his presence at trial"); *Tirado-Tirado*, 563 F.3d at 123–25 (same); *United States v. Yida*, 498 F.3d 945, 960–61 (9th Cir. 2007) (same).  Thus, the "good-faith, reasonable efforts" required under the rule include a "duty to use reasonable efforts to prevent a witness from becoming absent in the first place."  *Burden*, 934 F.3d at 689; *see also Yida*, 493 F.3d at 956 (reasonableness inquiry should "include an assessment of the government's affirmative conduct which allowed [the witness] to be deported … in the first instance.").

Yet these cases focus on affirmative government conduct, like deportation, that renders a witness unavailable for trial and do not support the defendant's theory of unavailability for at least two reasons.  First, the government took no affirmative steps to render unavailable the witnesses in this case, who died of natural causes.  In *Burden*, as in *Tirado-Tirado*, death is contrasted explicitly with removal, and the deceased witness is presented as a clearly unavailable witness.  *See Burden*, 934 F.3d at 686; *Tirado-Tirado*, 563 F.3d at 123.

Second and more importantly, the record in this case does not show that the government "procured" or "wrongfully caused" the unavailability of its witnesses. Under the defense theory of unavailability, the government intentionally cloaked the flaws in the forensic hair testimony presented in the defendant's case, resulting in the almost fifty-year delay in the retrial. *See* Def.'s Opp'n at 3; Def.'s Reply at 15. Yet, the chronology of events does not show that the government engaged in purposeful delay in order to make its prior witnesses unavailable and trigger reliance under Rule 804(b)(1) on the transcripts of their prior testimony instead. In 2012, the FBI and Department of Justice began a "comprehensive review of microscopic hair comparison analysis testimony from more than 20,000 cases litigated before the routine use of mitochondrial DNA." Gov't's Omnibus Reply to Def.'s Opp'n to Gov't's Admission of Prior Trial Testimony and Mot. to Dismiss or Exclude Transcripts for Alleged *Brady* and Rule 16 Violations ("Gov't's Omnibus Reply") at 10–11, ECF No. 98. The defendant's case was reviewed in June 2015, Wong Ltr. at 7, at which point the government determined that hair matching testimony presented against the defendant had "exceeded the limits of science," *id*. at 2. The United States Attorney's Office for the District of Columbia was notified on September 11, 2015, *id*. at 1, and the defendant's attorneys were notified eleven days later, on September 22, 2015, Cohen Ltr. at 1; *see also* Gov't's Omnibus Reply at 11.

In notifying the defendant, the government conceded that the hair matching evidence "should be treated as false evidence," and that "knowledge of the falsity should be imputed to the prosecution." Def.'s Mot. to Vacate, Ex. C, Letter from Peter J. Kadzik to Sen. Richard Blumenthal (Sept. 15, 2015) ("Kadzic Ltr.") at 2, ECF No. 2-1; Cohen Ltr. (appending Kadzic Ltr.). The purpose of this admission was to "allow the parties to litigate the effect of the false evidence on the conviction in light of the remaining evidence in the case." Kadzik Ltr. at 2.

That is to say, the concession was designed to remove procedural barriers to new litigation under 28 U.S.C. § 2255, not to "affirmatively concede[] falsity or knowledge as a factual matter." Gov't's Omnibus Reply at 12. This concession was made as part of a broader effort to investigate and respond to overstated hair matching testimony in the past. Thus, DOJ made "a policy decision to allow defendants to pursue judicial review of the potential materiality of the erroneous statements," not "an affirmative 'concession' that the testimony of the forensic expert was, in fact, false or misleading and that the government knew or should have known so at the time of the defendant's trial." Gov't's Omnibus Reply, Ex. A, Decl. Andrew D. Goldsmith (Nov. 12, 2019) at 3–4, ECF No. 98-1.

Brushing over this fairly prompt timeline from determination to communication of that determination to the defendant, the defense theory of unavailability looks farther back in time to fault the government for failing to correct the forensic hair examiner's testimony decades earlier. This longer-range attempt to hold the government accountable for the unavailability of the witnesses due to the passage of over forty years is not supported by the record either. At the outset, the record does not indicate that the government's microscopic hair analyst, Special Agent Robert Neil, knew at the time of the original trial that his testimony was false or misleading. Neil testified that 28 of 49 hairs collected from the crime scene were "microscopically identical" or "microscopically similar" to the defendant's known hair samples. Trial Tr. (Aug. 22, 1972) at 414–23. On cross examination, however, Neil admitted that "microscopic hair comparisons do not constitute a basis of positive personal identification." Trial Tr. (Aug. 22, 1972) at 450. He further clarified that "the questioned hairs either originated from the person represented by the known sample or from some other person of the same race whose head hairs or pubic hairs, whichever the case may be, exhibit the same identical

microscopic characteristics." *Id*. at 450–51. In other words, the record does not indicate that Neil knowingly concealed the limits of his analysis as he understood them, or that he falsely led the jury to believe that the hairs found at the crime scene positively matched those of the defendant to the exclusion of all others.

Thus, as a factual matter, the record does not support the contention that the government purposefully delayed revealing the evidence in the defendant's case, or that the government has failed to demonstrate "good-faith, reasonable efforts" to procure its witnesses for trial. Accordingly, the witnesses are "unavailable" within the meaning of Rule 804.

### 2. *Opportunity and Similar Motive*

The defendant further contends that the defense did not have an "opportunity and similar motive" to develop the government's witness testimony at the original trial. *See* Fed. R. Evid. 804(b)(1). In evaluating "opportunity," the proper focus is whether the party's ability to examine the testimony in question was impeded or otherwise limited at the prior proceeding. As the D.C. Circuit explained with regard to the Confrontation Clause in *United States v. Wilson*, 605 F.3d 985, 1004 (D.C. Cir. 2010), "'the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.'" (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987)).

Focusing in particular on the government's expert witnesses, the defendant first argues that he lacked an "opportunity" to cross-examine the now unavailable witnesses because at the time of the original trial, "relevant information, particular technical standards, and widespread availability of independent testing did not yet exist." Def.'s Prejudice Mem. at 31. Put another way, the defendant believes his opportunity to cross-examine would be more fulsome with today's forensic and scientific knowledge than was possible in 1972. He may be correct, but that

is not what Rule 804(b)(1) requires. The issue is not whether defense counsel might have advanced an additional line of questioning had the trial occurred later in time, but rather whether the trial court at the time prevented defense counsel from cross-examining the witnesses. Thus, in *Ross v. Dist. Att'y of the County of Allegheny*, 672 F.3d 198, 208 (3d Cir. 2012), the Third Circuit found no violation of the Confrontation Clause when a "failure to cross-examine" could not be "attributed to any decision by the court, or statutory limitation on the scope or nature of … cross-examination." Similarly, in *United States v. Watson*, the Eighth Circuit rejected a Confrontation Clause challenge, and found that a defendant did have an "opportunity" to cross-examine, since "the trial court did not limit the scope or nature of defense counsel's cross-examination in any way." 650 F.3d 1084, 1088 (8th Cir. 2011) (internal quotation marks and citation omitted). The fact that defense counsel chose not to cross-examine multiple witnesses during the defendant's original trial does not mean that the Court limited counsel's "opportunity" to do so. As the advisory notes to Rule 804 state, "no unfairness is apparent in requiring [a party] to accept his own prior conduct of cross-examination or decision not to cross-examine." Fed. R. Evid. 804, Advisory Committee Notes, 1972 Proposed Rules, Note to Subdivision (b); *see also United States v. Pizarro*, 717 F.2d 336, 349 (7th Cir. 1983) (quoting same).[4]

Second, the defendant argues that he lacked a "similar motive" during the original trial because prior defense counsel pursued a relatively narrow defense theory, while current counsel plans to pursue a broader trial strategy. Def.'s Prejudice Mem. at 39; Def.'s Reply at 17. According to the defendant, prior defense counsel chose not to contest government evidence

---

[4] The only line of questioning the original trial judge discouraged concerned the nature of the Noel's relationship with Richard Ecroyd. Yet, Ecroyd is alive and expected to testify. Any potential argument under Rule 804(b)(1) is therefore moot as to Ecroyd, since the defendant is free to develop Ecroyd's testimony through cross-examination at trial, and since the government does not now seek to admit Ecroyd's transcript testimony as an unavailable witness. *See* Gov't's Opp'n at 41; Gov't's Mot. at 1.

suggesting that the defendant had been in the building and even in the Noel's apartment prior to the murder, but proffered a defense theory that the defendant had not been present on the day of the crime. *See* Def.'s Prejudice Mem. at 39–40. Current defense counsel, by contrast, will develop a broader defense theory in two ways. First, current counsel intends to challenge the scientific validity of the government's expert testimony and to question the reliability of the eye-witness testimony used to establish the defendant's presence in the building prior to the crime. *See id.* at 31–37; Def.'s Reply at 18–25; Def.'s Opp'n at 4–6. Second, the defendant intends to introduce new evidence regarding a possible third-party perpetrator. Def.'s Prejudice Mem. at 3–10; Def.'s Reply at 17; Def.'s *Brady* Mot. In this sense, counsel "will highlight different issues at trial and will be on a different side of issues previously presented." Def.'s Reply at 17.

This argument also misinterprets the rule. Both parties rely on *United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc), for the proposition that similarity of motive turns "not only on whether the questioner is on the same side of the same issue at both proceedings, but also on whether the questioner had a substantially similar interest in asserting that side of the issue." 8 F.3d at 912. Yet in *DiNapoli*, the Second Circuit explained, "[w]here both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." *Id.* That is exactly the case here, where the defendant faces the same charge on retrial as he did at the original trial.

Moreover, unlike *DiNapoli* and other cases testing the boundaries of the "similar motive" requirement, this case does not involve the government's use of prior grand-jury testimony of an unavailable witness at a criminal trial. *See id.* at 913; *Carson*, 455 F.3d at 376; *United States v. Miller*, 904 F.2d 65, 66 (D.C. Cir. 1990). Instead, here the government seeks to admit prior

testimony subject to cross-examination at a prior criminal trial, where the defendant had a "substantially similar interest," indeed of "substantially similar intensity," to disprove the government's case against him. *DiNapoli*, 8 F.3d at 912, 914. In this sense, the "underlying issues" on retrial are the same as they were at trial. *See Salerno*, 505 U.S. at 326 (Blackmun concurring).

The D.C. Circuit has appraised similarity of motive in terms of the position and ultimate interests of the parties, not, as the defendant urges, in terms of competing trial strategies. In *Carson*, for example, the Circuit affirmed a decision not to admit prior grand-jury testimony under 804(b)(1) after finding that the "purpose" of examination at the grand-jury in question was different from that at trial. *See Carson*, 455 F.3d at 379. The key point for present purposes, however, is that the Circuit's analysis interpreted motive from a wide angle, at a broad level of generality: the "purpose" of the grand-jury proceeding was "to investigate a crime and identify possible criminals," while the issue at trial was simply "whether the appellants were involved in the triple murders." *Id.* In *Miller*, which also concerned the admissibility of prior grand-jury testimony under 804(b)(1), the Circuit similarly framed the "issue" at trial broadly, as "the guilt or innocence" of the defendants. *Miller*, 904 F.2d at 68.

The Ninth Circuit's "fundamental objectives" test, which the defendant also cites in support of his position, *see* Def.'s Prejudice Mem. at 39, similarly focuses on ultimate questions like guilt or innocence, rather than particular defense theories or trial strategies. In *United States v. McFall*, 558 F.3d 951, 963 (9th Cir. 2009), the Ninth Circuit "agree[d] with the D.C. Circuit's elaboration of the 'similar motive' test," and found that that the government's "fundamental objective" in questioning a grand-jury witness was to develop evidentiary support for its theory that the witness had conspired with the defendant in the case to commit extortion. This broad

objective, the Circuit then concluded, was "the same motive [the government] possessed at trial." *Id*; *see also United States v. Duenas*, 691 F.3d 1070, 1090 (9th Cir. 2012) (finding that motive at suppression hearing differed from motive at trial, where "[t]he issue … was whether the evidence proved [the witness's] guilt beyond a reasonable doubt, not the circumstances of his confession.").

Applying these standards, the defendant undoubtedly had a similar motive to cross-examine the government's witnesses during the original trial as now. In both circumstances, the defendant's ultimate interest and "fundamental objective" was to contest the government's evidence as much as possible, so as to disprove the felony-murder charge against him. If we define the "issue," as in *Duenas*, as "whether the evidence proved … guilt beyond a reasonable doubt," 691 F.3d at 1090, the issue at stake in 1972 is the same at the retrial. Approaching the similarity of motive analysis as the D.C. Circuit did in *Carson* and *Miller*, the requirement is clearly met. Even though defense counsel intends to present new arguments and evidence, the parties' position and ultimate interests at trial remain the same: to prove or disprove the guilt of the defendant.

### 3. *Bulk Evidence*

The defendant's third set of arguments, concerning the use of Rule 804(b)(1) to admit prior testimony in bulk, has greater force. According to the defendant, the unprecedented scale of the government's request to admit in full the prior testimony of twelve witnesses must be considered in determining whether to apply the rule. *See* Def.'s Prejudice Mem. at 30; Def.'s Reply at 13–15. Admitting so much prior testimony, the defendant argues, would "freez[e]" the new trial, Def.'s Reply at 14, leaving the defendant with a "trial by transcript" and a mere "replay of 1972," *id*. at 9.

Two factors bolster the seriousness of these concerns. First, as the defendant points out and the government concedes, in addition to the trial transcripts of the twelve unavailable witnesses, the government will rely on transcripts of prior trial testimony to refresh the recollection of many, possibly all, of the ten original witnesses who *are* available to testify at trial. *See* Def.'s Reply at 13; Gov't's Opp'n at 35 ("Many of the live witnesses' memories have faded or are gone completely, but their memories may be refreshed, or they may be impeached with their prior transcripts."). The government concedes that two key live witnesses in particular, Dr. James Luke, the medical examiner who performed the autopsy of Noel's body, and Richard Ecroyd, who found Noel on the night of the murder, have little memory of the events in question. *See* Def.'s Reply, Ex. 2, Letter from Sharon Donovan to Eugene Ohm, Adam Thompson (June 13, 2019) at 2, ECF No. 63-1 (discovery letter stating that Luke "has no independent memory of the case" and that Ecroyd "is nearly 82 years old and may be experiencing the onset of a degenerative medical condition"). In sum, the government will rely heavily, if almost entirely, on twelve witness trial transcripts under 804(b)(1), and on up to ten witness trial transcripts to refresh the recollection of live witnesses under Rule 803(5). *See* FED. R. EVID. 803(5) (providing, as an exception to the hearsay rule, that recorded recollections can be "read into evidence").[5]

---

[5] The government has an uphill challenge in seeking to read into evidence the prior testimony of the ten live witnesses, who are available to testify at retrial, under Federal Rule of Evidence 803(5), for at least two reasons. First, this Rule allows for recorded recollections to be "read into evidence" provided that the record "(a) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (b) was made or adopted by the witness when the matter was fresh in the witness's memory; and (c) accurately reflects the witness's knowledge." Fed. R. Evid. 803(5). Admission under the rule "requires that [a] witness verify the contents of the past statement, *United States v. Jones*, 601 F.3d 1247, 1262 (11th Cir. 2010), by "assert[ing] that the record accurately represented his knowledge and recollection at the time," *Lopez v. United States*, 373 U.S. 427, 448 n.1 (1963). Given the extent to which memories of the ten live witnesses have faded over the past forty-seven years, they may be unable to provide the requisite attestation regarding their prior testimony. Second, even if they are able to do so, reading their prior testimony into evidence remains subject to Rule 403 and the defendant's Sixth Amendment confrontation right. If the witnesses are completely unable to provide testimony regarding the factual matter for which they are being called, due to the passage of time and withering memory not attributable to any action by the defendant, the defendant's ability to cross-examine the witnesses may be so compromised as to require

Second, much of the key evidence in the case—including fingerprint and firearms analysis, identifications of the defendant, and the police investigation at the crime scene—comes from now unavailable witnesses. *See* Gov't's Mot., Ex. A, B, C, D, G, H, I, J, ECF Nos. 79-1–79-8. The government cites no precedent, nor does such precedent exist, for admitting, under Rule 804(b)(1), the prior testimony not of one or two but rather of twelve witnesses in a single case. *See* Def.'s Reply at 13–14; Gov't's Opp'n at 43–44 (citing cases in which the prior testimony of multiple, but of no more than three, unavailable witnesses was admitted under Rule 804(b)(1)).

Unsurprisingly, Rule 804(b)(1) has not previously been used to admit, in bulk, the prior testimony of twelve witnesses; after all, the rule was designed as an *exception* to a broader principle prohibiting the admission of hearsay. *See Salerno*, 505 U.S. at 318 (describing Rule 804(b)(1) as "an exception to the hearsay rule"). That broader principle, codified in Federal Rules of Evidence 801(c) and 802, "prohibits admission of certain statements made by a declarant other than while testifying at trial." *Id.* at 320. The government's motion treats 804(b)(1) not as an exception but rather as the primary vehicle for the admission of key evidence to prove the criminal charge against the defendant. While the rule contains no express limit for the number of times or the scope of the proffered evidence for which it can be invoked in the

---

that their prior testimony be excluded under the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59, n.9 (2004) (finding that the Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial *to defend or explain it*.") (emphasis added); *United States v. Owens*, 484 U.S. 554, 560 (1988) (finding that Confrontation Clause was not violated by use of prior statement of witness, who suffered memory loss from being beaten with a metal pipe by defendant when defendant on cross examination had "the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination . . .) the very fact that he has a bad memory."); *Cookson v. Schwartz*, 556 F.3d 647, 651 (7th Cir. 2009) (explaining that physical appearance alone is insufficient to satisfy the requirements of the Confrontation Clause under *Crawford*); *see also Goforth v. State*, 70 So. 3d 174, 186–87 (Miss. 2011) (holding that admission of a recorded recollection under Rule 803(5) violated the Confrontation Clause when the witness whose statement was admitted suffered from a "total lack of memory" due to car accident not associated with any action by defendant).

course of a single proceeding, doing so to the extent proposed here arguably runs contrary to the

purpose of the rule, raising troubling fairness concerns in the process.  The defendant is correct

that he is entitled to a new trial, not a replay of an old one on paper.  These concerns are best

addressed in consideration and stringent application of Rule 403.  With these concerns in mind,

and for the reasons explained below, much of the prior testimony the government seeks to admit

must be excluded under Federal Rule of Evidence 403.

### B.  Rule 403

Any evidence admissible under Rule 804(b) must also pass muster under Federal Rule of

Evidence 403.  Under Rule 403, even relevant evidence may be deemed inadmissible and subject

to exclusion if "its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence."  FED. R. EVID. 403; *see also United States v.*

*Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011).  A court has "'broad discretion to weigh the extent of

potential prejudice against the probative force of relevant evidence.'"  *Athridge v. Aetna Cas. &*

*Sur. Co.,* 604 F.3d 625, 633 (D.C. Cir. 2010) (quoting *Frederick v. District of Columbia*, 254

F.3d 156, 159 (D.C. Cir. 2001)); *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379,

384 (2008).  To determine whether to exclude evidence under the rule, courts must "engage in

on-the-spot balancing of probative value and prejudice and … exclude even factually relevant

evidence when it fails the balancing test."  *Moore*, 651 F.3d at 63 (internal quotation marks

omitted) (quoting *Sprint/United Mgmt. Co.*, 552 U.S. at 384)).  This balancing test "requires a

fact-intensive, context-specific inquiry."  *Sprint/United Mgmt. Co.*, 552 U.S. at 388.

Importantly, "'[u]nfair prejudice' within [the Rule 403] context means an undue tendency to

suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

*United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting Fed. R. Evid. 403 advisory

committee's notes).

Where, as here, a party seeks the admission of "entire transcripts" into evidence, the

"required analysis [under Rule 403] is context-specific and must be made on a case-by-case

basis." *Amobi v. Brown*, 317 F. Supp. 3d 29, 40 (D.D.C. 2018). Accordingly, the admissibility

of the prior trial testimony of each of the twelve witnesses proffered by the government is

addressed seriatim.[6] The government's four police witnesses are addressed first, followed by the

government's five fact witnesses. The government's three expert witnesses are addressed

separately in Section III.C, *infra*.

### 1. *Donald Cherry*

Officer Donald Cherry of the Metropolitan Police Department ("MPD") investigated the

crime scene on December 14, 1971, shortly after the murder took place. *See* Govt's Mot., Ex. A

(Test. of Donald G. Cherry) at 202, ECF No. 79-1. Cherry's testimony at trial relied extensively

on an in-court diagram of Noel's apartment that Cherry had made but no longer exists. In

addition, the government used Cherry's testimony to identify numerous exhibits that had been

collected from the murder scene but have since been lost or destroyed. Though Cherry's

testimony was at the time of the original trial critical and probative of the physical evidence

admitted against the defendant, this probative value is substantially diminished because the

physical evidence, including the in-court diagram, that contributed to making his testimony

cohesive and intelligible no longer exists. In short, the introduction of this testimony inescapably

---

[6] Though directed by the Court to make specific arguments under Rule 403 in relation to each witness, *see* Hr'g Tr. (Sept. 19, 2019) at 58:19–22, ECF No. 74, the parties did not do so, except as to the government's proffered expert witnesses.

invites juror confusion that substantially outweighs the testimony's probative value for two principle reasons, as close examination of the proffered trial testimony confirms.

First, Cherry's testimony cannot be meaningfully understood or evaluated without the in-court diagram mapping the layout of the Noel's apartment where she was murdered for the simple reason that he frequently refers to this diagram. *See id*. Cherry described the apartment to the jury at some length, making repeated reference to the diagram, *id.* at 202–8, and even stepping down from the witness box to "explain" the diagram to the jury, *id*. at 206. As the government introduced individual pieces of physical evidence, Cherry then explained, again with reference to the diagram, where each piece was found in the apartment. The result is a series of passages, like the following, that rely heavily for context and meaning on the physical object the government sought to enter into evidence in combination with the diagram, and notably lack any clear record on paper alone of precisely what Cherry was testifying to:

> Q: Officer, we can take it out of this bag here. Now could you make a marking on the chart as to where that coat was located as you saw it when you were at the scene?
> A: I will use the number 1, if it is all right.
> Q: Yes, please. That is approximately where that coat was lying when you saw it?
> A: Yes, sir.

*Id*. at 209. This pattern continues, as Cherry identifies, describes, and marks on the diagram multiple pieces of physical evidence, including: the decedent's coat, *id*. at 209; a purple dress, *id*. at 210; the decedent's pantyhose, *id*.; the decedent's panties, *id*. at 212; the perfume vials found in the apartment, *id*. at 220–21; and so on, *see id*. at 213–16. In these passages, too, Cherry's testimony is unclear without the physical objects and his markings on the diagram. Asked about Exhibit No. 11, for example, Cherry testifies:

> A: Yes. This is a carpet tile I removed from the floor of the room there…
> Q: You removed that piece yourself?
> A: Yes, sir; I did.
> Q: Can you point before you mark where you took that piece out?

A: I took it from right here.

*Id*. at 215.

The government states that contemporary images and floorplans of the apartment will be provided and that the apartment apparently still exists in an unchanged configuration. S*ee* Gov't's Omnibus Reply. at 22–23. Yet reintroducing Cherry's testimony without the visual aid on which he actively relied on may exacerbate jury confusion and lead to complete guess-work by the jury about what Cherry's original testimony meant. Plainly, the absence of his original diagram with his markings as to where evidence was found poses a significant obstacle to jurors following his testimony and properly visualizing the scene. Indeed, as the quotation above demonstrates, much of the testimony is virtually meaningless without the diagram and physical objects to which the prosecutor and Cherry refer. As such, this testimony's probative value, today, at a new trial, is markedly reduced.

Second, as noted, the loss of the physical evidence identified and referred to in Cherry's testimony compounds the risk of juror confusion. In 1972, the jury would have seen these pieces of evidence as they were presented; a jury today will not. In some cases, the absence of referenced exhibits will make impossible any assessment by the jury of whether the testimony makes sense. In one set of exchanges, for example, the prosecutor relies on photographs of the exterior of the Noel's apartment building to develop its theory that the defendant fled the scene by jumping out of a window. *See id.* at 232–35. Without these photographs, a jury today would find it difficult to picture, let alone appraise, statements like "[a]cross this cross-piece there were also scuff marks," *id*. at 234, or "[t]he other here just looked like maybe a little edge mark, just an indentation, very slight," *id*. at 235. Similar problems of interpretation appear in defense

counsel's cross-examination, which also relies heavily on the in-court diagram. *See id.* at 239–44.

For these reasons, the risks of confusing and misleading the jury substantially outweigh the probative value of Officer Cherry's testimony. This testimony is therefore excluded under Rule 403.

### 2. *Robert Laughery*

Robert Laughery, a technician in the MPD's Mobile Crime Lab, also investigated the crime scene. *See* Gov't's Mot., Ex. F, (Test. of Robert E. Laughery) at 257–58, ECF 79-4. Like that of Officer Cherry, Laughery's former trial testimony depends on exhibits that no longer exist and therefore risks confusing and misleading the jury. At trial, Laughery testified that he observed footprints and found three perfume vials and one chapstick outside the building, beneath the Noel's apartment window. *Id*. at 258–60. Much of Laughery's testimony relied on photographs he took of both this outside-the-apartment evidence and the inside-the-apartment crime scene that were used to illustrate to the jury exactly where the items had been found, as well as the site and appearance of the building's exterior. *See id*. at 260–66. These photographs were entered into evidence and shown to the jury. *See, e.g.*, *id.* at 263. Without them, Laughery's testimony is markedly both less probative and more confusing. To explain where the perfume vials were found, for instance, the following exchange took place:

> Q: Could you circle the three vials of perfume in that photograph?
> A: (complied)
>     [Prosecutor]: If Your Honor please, at this time may the Exhibit No. 24 be presented to the jury for their view?
>     The Court: Very well. Hand it to the marshal.

*Id*. Similar exchanges focused on the now destroyed photographs occupy five and a half transcript pages, more than half of Laughery's direct testimony. *See id*. at 261–66. Neither the

physical evidence nor the photographs used to mark and discuss their locations still exists. Without these visuals, a new jury will likely be confused by Laughery's testimony and, unlike the original jury, have little to no means to appraise the testimony. For these reasons, the risk of confusion and unfair prejudice substantially outweighs the testimony's probative value and the testimony is excluded under Rule 403.

### 3. *Alfred N. Walton*

Alfred N. Walton, an MPD latent fingerprint examiner, was called by the government to authenticate known fingerprints of the defendant, which another MPD fingerprint examiner, Joseph Mullinax, then used to compare with an unknown, latent fingerprint found in the Noel's apartment. *See* Gov't's Mot. to Admit, Ex. K (Test. of Alfred N. Walton) at 472, ECF No. 79-9. Walton's role in this process was limited; he made "inked fingerprints" of the defendant after his arrest, in January 1972. *Id*. at 473–74. In other words, Walton made known fingerprints of the defendant that were then used in a forensic analysis conducted by Mullinax. The purpose of Walton's brief testimony was to authenticate the known fingerprints as evidence and to confirm that they belonged to the defendant. *See id*. at 474–75. Walton's testimony is neither confusing nor prejudicial and, consequently, Rule 403 would pose no bar to its admissibility. Apart from Mullinax's testimony, however, Walton's testimony has no independent probative value and is simply irrelevant, under Rule 401. Since Mullinax's testimony is inadmissible under Rule 702, *see infra* Section III.C., Walton's testimony is excluded as irrelevant.

### 4. *Otis Fickling*

MPD Detective Otis Fickling was called by the government to authenticate and establish the chain of custody for certain evidence recovered from the defendant at the time of his initial arrest in New York City three days after Noel's murder. Fickling traveled to Manhattan to arrest

and take custody of the defendant from New York City police, and also took custody of a revolver, holster, and ammunition, as well as a small perfume vial seized from the defendant's person upon his initial arrest. *See* Gov't's Mot., Ex. D (Test. of Otis Fickling) ("Fickling Test.") at 543–544, 546–47, ECF No. 79-2. Fickling then transferred custody of the items to the FBI. *Id*. at 547. Fickling's testimony confirms this chain of custody and identifies the items, none of which were admitted through his testimony. Thus, even though the underlying evidence no longer exists, Fickling's testimony as to chain of custody, *id*. at 543–54–57, is admissible under Rule 403.[7]

In addition, Fickling testified about showing a photo array in 1972 at the office of the prosecutor to Dorothy Rager, a neighbor who lived in the same apartment building as Noel at the time of the murder. *See id*. at 544–55. For the same reasons Rager's testimony is inadmissible, *see infra* Section III.B.6, this portion of Fickling's testimony is also substantially more prejudicial than probative and therefore excluded under Rule 403.

### 5. *Grace Thompson Pyles*

Grace Thompson Pyles lived in the same apartment building on the same floor as Noel and was called to testify that she heard a scream and a gunshot on the night of the murder. *See* Gov't's Mot., Ex. H (Test. of Grace Thompson Pyles) ("Pyles Test."), ECF No. 79-6. Specifically, Pyles testified that she was in her apartment on December 14, 1971, and heard "a blood-curdling scream," roughly "fifteen minutes, maybe seventeen minutes of six." Pyles Test.

---

[7] While Fickling's testimony as to chain of custody regarding the items seized from the defendant at the time of his arrest may be admissible under Federal Rules of Evidence 804(b)(1) and 403, these items may nonetheless be excluded depending on the resolution of the defendant's pending motion challenging the constitutionality of his initial arrest, on December 17, 1971, at a hotel in New York City by New York police officers. *See* Def.'s Mot. to Suppress Tangible Evidence, ECF No. 80. Fickling was not the officer responsible for that arrest, *see* Fickling Test. at 544, but should the pending suppression motion be granted, Fickling's testimony about the items seized from the defendant would be excluded as irrelevant, since the items themselves would be suppressed as fruit of the poisonous tree. *See Won Sun v. United States*, 371 U.S. 471, 484-86 (1963).

at 146.  Asked how she remembered the exact time, she explained that she remembered calling

her Aunt.  *Id*. at 147.  "And if I call her," Pyles stated, "it is at that time, because her maid comes

in at six o'clock and says, Dinner is served.  And I think fifteen minutes is long enough for a

conversation."  *Id*.  Pyles then testified that she "heard a shot," "about ten minutes later."  *Id*.

Pyles was never asked whether she recognized the scream at the time as coming from

Noel or even Noel's apartment.  There is no dispute that Noel died of a gun-shot wound so

Pyles' testimony about hearing the shot adds little to the evidence, other than that she may have

screamed beforehand.  Testimony about Noel's "blood-curdling scream" may illuminate the

terror Noel suffered before her demise but otherwise has little bearing on the issue of whether the

defendant was the cause.

Set against this minimal relevance of Pyles' testimony is that fact that her testimony

conflicts with separate testimony given by another witness about the events surrounding the

murder.  Specifically, Richard Ecroyd testified that he heard a scream after knocking on the

Noel's door, and then heard a gunshot "right after the scream," Trial Tr. (Aug. 21, 1972) at 154,

rather than ten minutes later, as Pyles indicates, *see* Pyles Test. at 147.  Should the jury

determine that this discrepancy is important, it will have no way of independently assessing the

accuracy of Pyles' testimony, her stated habit of calling her Aunt at a particular time, or her

means of remembering what she heard on the night of December 14.  As the advisory notes to

Rule 804(b) acknowledge, "[o]pportunity to observe demeanor is what in a large measure

confers depth and meaning upon oath and cross-examination."  FED. R. EVID. 804, Notes of

Advisory Committee on Proposed Rules, Note to Subdivision (b).

Thus, even when prior testimony meets the requirements of Rule 804(b)(1), it is still be

subject to exclusion under Rule 403 when inconsistencies apparent in the testimony raise

prejudice concerns that substantially outweigh the testimony's probative value. *See Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1988) (upholding exclusion under Rule 403 of deposition transcript upon finding that "serious doubts … as to the accuracy of the deposition" resulted a "potential for unfair prejudice."); *Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340, 344 (6th Cir. 1985) (upholding exclusion under Rule 403 of deposition otherwise admissible under Rule 804(b)(1)). In *Li*, the Second Circuit found exclusion of a deposition proper when the deponent's statement raised doubts as to the deposition's accuracy, leaving the record in "a state of equivocation." *Li*, 142 F.3d at 89. That is exactly the case here, where Pyles' absence makes clarification impossible. This fact is only compounded by concern that her testimony has minimal probative value and is prejudicial in focusing on Noel's fright at the time of the murder. For these reasons, Pyles' testimony is substantially more prejudicial than probative, and is excluded under Rule 403.

### 6. *Dorothy Rager*

Admitting the prior testimony of Dorothy Rager similarly risks unfair prejudice to the defendant by limiting the jury's capacity to make necessary credibility determinations and risking jury confusion. Rager lived in Apartment 324, next door to the Noel's Apartment 326. *See* Gov't's Mot., Ex. I (Test. of Dorothy Rager) ("Rager Test.") at 316, ECF No. 79-7. Rager testified to having seen the defendant in the third-floor hallway, near Noel's apartment, on two separate occasions only a few days before the murder. *Id*. at 317–20. On the first occasion, on December 9, 1971, Rager reportedly saw a "tall" man wearing a "Moroccan robe" and a "red fez." *Id*. at 318. The following night, on December 10, 1971, she testified that she saw the same man dressed differently, wearing a "gold and brown tweed jacket," a "blue and white striped shirt," and "carrying a case." *Id*. 319. Though both encounters were brief, Rager stated that she

saw the man's face clearly as he passed under an overhead light in the hallway, *id.* at 318, and provided a description of the man's facial features, using gestures as well as words, *id*. at 320. As she testified on direct regarding the man's appearance, Rager described herself as "an artist and a sculptor." *Id*. at 321. Asked about her visual memory on cross-examination, she relied on this avocation to affirm the accuracy of her recollections, stating: "I can get a lot in one glance. I have been practicing the Oriental way of painting for many years, and I absorb the entire picture of something." *Id*. at 344. The original jury, in 1972, had an opportunity to assess the credibility of these statements: the witness's stated ability, as an artist, to grasp the entirety of a visual image in a brief instant, and the accuracy of her physical descriptions. A new jury will not. Without such an opportunity, a new jury will have no sense of Rager's demeanor, candor, or general reliability. In other words, the probative value of Rager's two separate sightings is diminished, while the risk of unfair prejudice is amplified.

In addition, Rager's testimony included two identifications of the defendant, one via a photo array and the other in court. First, Rager testified that she had previously identified a photograph of the defendant, shown to her in a photo array in the office of the prosecutor before trial, as the man she saw in the building. *See id.* at 324–25. The prosecutor then asked Rager whether the man she had identified in the photograph was present in the courtroom, in response to which Rager identified the defendant in court. *See id*. at 325–26.

In a separate motion, the defendant now challenges the constitutionality of the photo array used for both identifications. *See* Def.'s Mot. to Suppress Identification Evidence ("Def.'s Mot. Suppress") at 4–6, ECF No. 81. Indeed, questions about the constitutionality of the photo array were raised by the Court *sua sponte* in a sidebar the government proposes to extract from the transcript to be admitted at the retrial. *See* Rager Test. at 321–22. During the sidebar, the

trial judge noted that some of the photographs in the array had "highly suggestive" printed dates on them, while another depicted an individual in handcuffs. *Id*. at 322. These features appeared "suggestive to the Court," *id*., even though, as the government points out, defense counsel did not object to their admission, *id*. at 322; Gov't's Opp'n to Def.'s Mot. to Suppress Identification Evidence ("Gov't's Opp'n Mot. Suppress") at 8, ECF No. 89.

This Court must decide independently whether the photo array should be suppressed, using standards not yet in place at the time of the original trial. *See, e.g.*, Def.'s Mot. Suppress at 5 (citing *Manson v. Braithwaite*, 432 U.S. 98 (1977)); Gov't's Opp'n Mot. Suppress at 5 (citing *United States v. Rattler*, 475 F.3d 408 (D.C. Cir. 2007)). The photo array, along with all the other physical evidence in this case, has been destroyed, however, and thus no means are available for making an independent determination. The trial record makes clear that significant indicators of suggestiveness were present in the photo array, *see* Rager Test. at 322, but defense counsel at the time chose not to challenge the evidence, likely because the defense theory at the original trial was that the defendant may have been present near and even in Noel's apartment *before* but not at the time of the murder. In these circumstances, admission of Rager's prior trial testimony making a positive identification based on a questionably suggestive photo array to a jury unable to assess the witness's credibility and without the Court being able to reconsider independently the constitutionality of the underlying evidence, while tying the defendant to a defense theory different than the one he seeks to present on retrial, is unfairly prejudicial.

For these reasons, the risk of unfair prejudice substantially outweighs the probative value of Rager's prior testimony, and that testimony is excluded.

### 7.    *George Elgy Crockett*

George Elgy Crockett was a porter in the building where Noel lived at the time of the murder.  *See* Gov't's Mot., Ex. B (Test. of George Elgy Crockett) ("Crockett Test.") at 360–61, ECF No. 79-2.  Crockett testified that on December 10, 1971, four days before the murder, he received a call to attend to Apartment 330, on the same floor as Noel's apartment.  *Id*. at 361.  In the hallway on the way to the apartment, Crockett passed a man wearing "robes, cream colored, with fringe, and a black fez," who said "Good morning" as he passed.  *Id*.  Notably, Crockett's testimony about the date when he observed the man in robes differs from that of Rager, who reported seeing such a man on December 9.  *See* Rager Test. at 318.  In Apartment 330, Crockett noticed markings near the lock on the kitchen door that looked as if paint "had been scrubbed off" from "the bolts and the lock."  Crockett Test. at 363.  Defense counsel chose not to cross examine Crockett, *see id*., and his testimony was relatively brief, spanning four transcript pages, *id*. at 360–63.

Unlike the examples discussed above, Crockett's testimony is not confusing or unfairly prejudicial; his observations are stated in relatively plain language and do not rely on now unavailable physical evidence or visual aids.  Yet because the testimony is so brief, and because Crockett did not independently identify the defendant as the man wearing a fez, the testimony's probative value is extremely limited.  Indeed, the testimony is only linked to the defendant in conjunction with the separate testimony of Dorothy Rager, who also saw a man in the building wearing a fez on a different date, and who identified that man as the defendant.  Since Rager's testimony has been excluded, *see supra* Section III.B.6, Crockett's testimony is no longer particularly probative or relevant, and is likewise excluded under Rule 403.

### 8.     *Susan Shook*

Susan Shook was a neighbor, who lived in Apartment 330, where Crockett was called to attend on December 10, 1971.  Shook testified that upon returning home on the evening of December 9, she noticed several unusual things: her cats, normally friendly, appeared scared; the apartment smelled of perfume; and her cats' bowls had been filled with milk, not by her but by some other means.  *See* Gov't's Mot., Ex. J (Test. of Susan Shook) ("Shook Test.") at 351–52, ECF No. 79-8.  On the morning of December 10, Shook further testified, she again noticed unusual activity, which prompted her to call the building office.  *Id*. at 354.  First, Shook's cat began to growl.  *Id*. at 353.  Then, as Shook turned toward the kitchen, she saw the door closing slowly.  *Id*. at 354 ("I got up and went towards the kitchen and got there in time to see the kitchen door, this is the door leading to the hallway, close. When I got there, it was open about that wide (indicating). And I just saw it close very slowly and very silently.").  At the close of Shook's brief testimony, defense counsel moved for a mistrial on the grounds that the government had improperly introduced evidence of an unrelated, separate crime, that is, either burglary or unlawful entry as to Shook's apartment.  *See* Trial Tr. (Aug. 22, 1972) at 355–59, 364–65.  The trial judge denied the motion but gave the jury a limiting instruction, directing it "not to consider the testimony of [Shook and Crockett] in any way as proof or tending to show that Mr. Ausby may have committed any other crimes…" *Id*. at 365–66.  In its motion to admit the trial transcripts, the government excised this exchange from the transcripts of Shook and Crockett, as well as all sidebar exchanges between counsel and the trial judge.  *See* Shook Test. at 355; Crockett Test. at 363.

Shook's testimony, like that of Crockett, is straightforward and relatively brief, and presents little risk of confusing or misleading the jury.  Yet Shook's testimony is linked to the

defendant even more tenuously than Crockett's, since Shook never saw the intruder in her apartment. Without the testimony of Rager and Crockett, Shook's testimony has no probative value. Accordingly, the testimony is excluded under Rule 403.

### 9. *Charles Joseph Wesley*

Charles Joseph Wesley, who worked in maintenance in the building where Noel lived, was called by the government to testify about how Noel was discovered on the day of the crime. *See* Gov't's Mot., Ex. L (Test. of Charles Joseph Wesley) at 172–73, ECF No. 79-10. On December 14, 1971, Wesley was called to the third floor, where Richard Ecroyd was trying unsuccessfully to open the door to the Noel's apartment, which was locked from the inside with a chain. *Id*. at 174. "Two or three minutes" later, Wesley used a tool to "undo the links of the chain" and opened the door, where he found Noel's body. *Id*. at 175. In his testimony, Wesley described his recollection of the scene, including the location of Noel's body and the fact that the kitchen door was unlocked. *Id*. at 176–77. Separately, Wesley testified, generally consistent with the testimony of Crockett, that on December 10, he saw a "stranger" wearing an "African gown[]" and a "fez" in the building's first-floor hallway. *See id*. at 178–79.

Wesley's testimony about the events at the time of Noel's murder is not particularly confusing and principally concerns facts that the defendant does not dispute, regarding the manner in which the Noel's body was found. This portion of Wesley's testimony is not unfairly prejudicial to the defendant and is therefore admissible under Rule 403.

At the same time, however, Wesley's description of the clothing and appearance of the man he saw on December 10, 1971 did not result in an identification of the defendant and is only relevant based on Rager's testimony of seeing a man she identified as the defendant dressed similarly on a different day, December 9, 1971. Since Rager and Crockett's testimony has been

excluded, *see supra* Sections III.B.6 and 7, Wesley's testimony about the man he saw on December 10 is no longer particularly probative or relevant, and is likewise excluded under Rule 403.

### C.     Rule 702

Finally, the defendant moves to exclude the prior testimony of the government's three original expert witnesses, Joseph Mullinax, Cortland Cunningham, and Alvin E. Hodge. *See* Def.'s Prejudice Mem at 10–17; Def.'s Fingerprints Mot.; Def's Firearms Mot. The government, by contrast, seeks to admit the trial testimony transcripts for each of these witnesses. *See* Gov't's Mot. at 1; Gov't's Opp'n to Def.'s Mot. to Exclude Fingerprint Testimony Under Federal Rules of Evidence 702 and 403 ("Gov't's Fingerprints Opp'n"), ECF No. 115; Gov't's Fingerprints Surreply; Gov't's Opp'n to Def.'s Mot. to Exclude Testimony of Gov't's Proposed Expert Witnesses in Firearms Examination ("Gov't's Firearms Opp'n"), ECF No. 114. After discussion of the standards under Rule 702 applicable generally to expert witnesses, each witness is examined in turn.

#### 1.     *Rule 702 Generally*

The defendant's original trial, in 1972, predated the adoption of the Federal Rules of Evidence. At the time, the admissibility of expert testimony turned on whether an expert's method was "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Federal Rule of Evidence 702 superseded the "general acceptance" test articulated in *Frye*. *See Daubert*, 509 U.S. at 587–89. In determining whether the government's expert testimony is admissible at retrial, Rule 702 and *Daubert* apply, not the now superseded *Frye* test.

Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify provided that: "(a) the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party seeking to introduce expert testimony bears the burden of demonstrating that these requirements are met. *United States v. McGill*, 815 F.3d 846, 903 (D.C. Cir. 2016) (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127, n.9 (D.C. Cir. 2001)).

In *Daubert*, the Supreme Court made clear that district courts have a "gatekeeping responsibility" to "ensure that any expert testimony is based on 'scientific knowledge' that 'will assist the trier of fact to understand or determine a fact in issue.'" *McGill*, 815 F.3d at 903 (quoting *Daubert*, 509 U.S. at 592); *see also United States v. Nwoye*, 824 F.3d 1129, 1136 (D.C. Cir. 2016). In other words, courts must engage in a two-part analysis for admissibility under Rule 702 by determining "first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 592)); *see also United States v. Hite*, 769 F.3d 1154, 1169 (D.C. Cir. 2014).

In performing its gatekeeping function to determine whether expert testimony is scientifically valid, courts "must focus 'solely on principles and methodology, not on the conclusions that they generate.'" *Ambrosini*, 101 F.3d at 133 (quoting *Daubert*, 509 U.S. at 595); *see also Raynor v. Merrell Pharm. Inc.*, 104 F.3d 1371, 1375 (D.C. Cir. 1997). In *Daubert*, the Supreme Court articulated a non-exhaustive list of factors to consider in appraising scientific validity, including whether a "theory or technique": (1) "can be (and has been) tested;"

(2) "has been subjected to peer review and publication;" (3) has a "known or potential rate of error;" (4) has "standards controlling the technique's operation;" and (5) "finds general acceptance in the relevant scientific community." *Daubert*, 509 U.S. at 593–94; *see also Ambrosini*, 101 F.3d at 134.

### 2. *The Government's Proffered Expert Witnesses*

#### a. *Joseph Mullinax*

Joseph Mullinax, an MPD fingerprint examiner, testified that a latent fingerprint found in Noel's apartment matched a known fingerprint of the defendant. Gov't Mot., Ex. G (Test. of Joseph Mullinax) ("Mullinax Test.") at 492, ECF No. 79-5. Mullinax's testimony began with a discussion of his experience "as a fingerprint examiner" in the MPD for "approximately two and a half years." *Id.* at 486. Prior to joining the MPD, he worked "in the Technical Section of the Identification Division of the FBI" for roughly "eleven and a half years," where his "duties consisted of classifying, searching, and filing of fingerprint cards," as well as "preparing fingerprints for comparison purposes and conducting identifications." *Id.* at 487. At the MPD, Mullinax's responsibilities similarly included "[c]omparing latent fingerprints with known fingerprints on file," as well as "processing of particular evidence recovered from crime scenes" and "processing of individual identification items, which includes photograph[s] of fingerprints and searching and filing of fingerprint cards." *Id.*

As to training, Mullinax reported "extensive training with the FBI," consisting of "three months of classroom instruction, and three months practical training under direct supervision." *Id.* at 487–88. Asked how many fingerprints he had examined over the course of his career, Mullinax estimated "hundreds of thousands." *Id.* at 488. The government then proffered

Mullinax "as an expert in the field of fingerprint of examination, analysis, and comparison." *Id*. Defense counsel did not object, and Mullinax was accepted as an expert by the Court. *Id*.

Proceeding to his substantive analysis, Mullinax explained that nine latent fingerprints had been recovered "from the windowsill area" inside Noel's apartment. *Id*. at 489. These prints "were of no value for identification purposes," however, because "they lacked sufficient quality for identification purposes." *Id*. at 490. Separately, Mullinax analyzed four latent fingerprints, also recovered from inside Noel's apartment, presented as government's Exhibit No. 32. *Id*. at 490–91. Without explaining precisely why, Mullinax testified that one of these prints, unlike all the others recovered from the scene, "was valid for identification purposes." *Id*. at 491. Mullinax "conduct[ed] an examination analysis" of the single valid print, comparing it with known fingerprints of the defendant. *Id*. at 492. Asked for his conclusion, Mullinax stated that "both of these impressions were made by the same individual, and that individual is identified on the fingerprint card as John Milton Ausby." *Id*. Asked further if he was "positive," Mullinax responded that there was "no doubt in [his] mind." *Id*.

Both the latent fingerprints found at the crime scene and the known fingerprints of the defendant used in Mullinax's comparison analysis have been destroyed. Gov't's Opp'n at 6. Since Mullinax in unavailable to testify, all that remains as a basis for determining whether his expert testimony is admissible is the seven-page trial transcript of Mullinax's direct testimony in 1972. Under these circumstances, the government fails to meet its burden under Rule 702 and *Daubert* for at least two reasons.

First, the record leaves unclear whether Mullinax had sufficient training and experience to qualify as an expert in fingerprint analysis and comparison. While Mullinax had eleven and a half years of experience at the FBI, his testimony suggests that his primary role there involved

the "classifying, searching, and filing of fingerprint cards," Mullinax Test. at 487, not the

examination and comparison of latent fingerprints. As the defendant correctly points out, latent

fingerprint analysis is different from the making, filing, and classifying of known fingerprints.

*See* Def.'s Fingerprints Mot. at 12–13; Def.'s Fingerprints Mot., Ex. 1, Declaration of David A.

Stoney (June 20, 2019) ("Stoney Decl.") at ¶¶ 11–14, ECF No. 100-1 (describing the distinction

between "latent print examinations" and "tenprint examinations"). Mullinax testified that his

duties at the FBI also included "preparing fingerprints for comparison purposes and conducting

identifications," Mullinax Test. at 487, but provided no detail as to what conducting

"identifications" entailed and whether this activity involved latent fingerprint analysis.

Bolstering concern about his experience, the defendant has submitted information from an

interview of Mullinax conducted by an investigator and attorney working on an unrelated case

for the Public Defender Service for the District of Columbia in 2014. In that interview, Mullinax

stated that he had worked as a "Fingerprint Clerk" at the FBI and that he was not considered a

fingerprint expert at the time. *See* Gov't's Opp'n, Ex. G, Letter from Jason Tulley to Brendan

Lokka & Brendan Wells (Feb. 6, 2014) at 2, ECF No. 56-1. This suggests that the training

Mullinax received at the FBI—the only formal training he mentioned during his testimony, *see*

Mullinax Test. at 487–88—may have only concerned the filing and classification of known

fingerprints, not latent fingerprint analysis. *See also* Stoney Decl. at ¶ 17 (stating that "[w]ork in

the technical fingerprint section of the FBI involves working with tenprint records, not latent

prints," and concluding that Mullinax's 2014 interview "confirms that his formal training was in

the classification and searching of tenprint records.").

  After leaving the FBI, Mullinax gained additional experience at the MPD, where he

worked for two and a half years before testifying at the defendant's trial. *See* Mullinax Test. at

486. Mullinax's testimony, however, provides little detail as to what extent his training and experience at the MPD concerned latent fingerprint examination. Mullinax mentioned no additional formal training, apart from the training he received at the FBI. The trial judge asked no questions and made no formal findings in qualifying Mullinax as an expert. *See id*. at 488. In other words, the record does not show that Mullinax had experience and training specifically relevant to the kind of fingerprint analysis his testimony subsequently concerned.

Second, Mullinax's testimony provides no means of assessing whether his methods of analysis were reliable and scientifically valid, as required under *Daubert*. As to *how* he matched the latent fingerprint found in the Noel's apartment to a known fingerprint of the defendant, Mullinax said only that he "conducted a comparison of these fingerprints with the fingerprints on file, the fingerprint card bearing the name of John Milton Ausby," *id*. at 491, and that he "conduct[ed] an examination analysis," *id*. at 492. The transcript contains no other explanation of the precise process Mullinax used to conduct that analysis, or whether such a process was widely used and accepted at the time. As such, the government cannot show that his testimony was "the product of reliable principles and methods," and that Mullinax "reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702(c)-(d). Nor can the government show that Mullinax's method was "subjected to peer review and publication," had "standards controlling [its] operation," and had "general acceptance in the relevant scientific community." *See Daubert*, 509 U.S. at 593–94 (listing factors for courts to consider in evaluating scientific validity).

The parties agree that the standard method of latent fingerprint examination used today is called Analysis, Comparison, Evaluation, and Verification ("ACE-V"), s*ee* Def.'s Prejudice Mem. at 12, n.11; Def.'s Reply at 23; Gov't's Opp'n at 27; Gov't's Fingerprints Opp'n, Ex. B,

Affidavit of Henry Swofford ("Swofford Aff.") at 5, ¶ 17, ECF No. 115-2, a method found

reliable under *Daubert* by the D.C. Circuit, *see United States v. Straker*, 800 F.3d 570, 631–32

(D.C. Cir. 2015). The government argues that while ACE-V had not yet been formalized in

1972, Mullinax's examination was "generally consistent" with the method's key components,

Gov't's Opp'n at 29, since "verification was practiced by the FBI as early as 1964," *id*. at 28, and

Mullinax purportedly "felt comfortable making an identification based on 10 points of

comparison, and would not make an identification on less than 7 or 8 points," *id*. at 29.[8]

Alternatively, the government argues that Mullinax's "former testimony remains reliable

irrespective of whether he applied ACE-V," since the "scientific basis of friction ridge

comparison has been reinforced since 1972," Gov't's Fingerprints Opp'n at 11, and "the

reliability of friction ridge examination is not substantially different today than it was in 1972,"

Gov't's Opp'n at 27. Both arguments fail because, on the available record, determining whether

Mullinax applied the equivalent of any of these methods in evaluating the evidence *in this case* is

impossible. Indeed, Henry Swofford, the modern forensics expert proffered by the government

to support Mullinax's testimony, is unable to state affirmatively that Mullinax's analysis was

reliable since all the underlying evidence is now gone. *See* Swofford Aff. at 2, ¶ 7 ("Without

access to the original evidence or documentation related to the specific practices applied in this

case, I am unable to render an affirmative opinion regarding the accuracy, appropriateness, or

reliability of the specific examination conducted by Mr. Mullinax in this particular case.").

---

[8] Mullinax reported adhering to this latter guideline, declining to reach a conclusion on the basis of fewer than seven or eight comparison points, in an interview conducted by government counsel on July 24, 2019. *See* Gov't's Opp'n, Ex. F, Affidavit of Elizabeth Marrero (n.d.) ("Marrero Aff."), at ¶ 6, ECF No. 56-1. According to the government, this practice was roughly consistent with Edmund Locard's 1914 "tripartite rule" for identification, which permitted identification on the basis of between 8 and 12 "concurring minutiae" depending on the clarity of the print and rarity of the minutiae, s*ee* Gov't's Opp'n at 28–29, and with guidelines produced by the FBI in 1964, *see* Gov't's Fingerprints Opp'n at 12; Gov't's Fingerprints Surreply at 6.

In addition, the government argues that any claim seeking to exclude "the proper application of the ACE-V methodology under Rule 702" is "frivolous," Gov't's Fingerprints Opp'n at 13, citing as support numerous cases from other circuits in which courts have found ACE-V reliable under *Daubert*, s*ee id*. at 14–16. This argument is a straw man, however, since the issue here is not whether modern fingerprint analysis is admissible in the abstract, but rather whether the specific fingerprint testimony given in this case, with little explanation as to what method the examiner used, before either ACE-V or the Federal Rules of Evidence existed, should now be admitted. While "[w]holesale objections to latent fingerprint identification evidence have been uniformly rejected by courts across the country," *United States v. Stone*, 848 F. Supp. 2d 714, 718 (E.D. Mich. 2012), the issue here is quite targeted. In this highly unusual case, no means of discerning, let alone appraising, the method Mullinax used to conduct his analysis, is available given the brevity of the prior testimony on the critical prerequisites for admission of expert testimony.

For these reasons, the government has failed to meet its burden of demonstrating admissibility under Rule 702, and Mullinax's testimony is excluded.

### b. *Alvin E. Hodge*

Alvin Hodge, a special agent who worked in the FBI's Serology Unit in Washington, D.C., was called by the government to testify about the presence of semen on Noel's body as well as on a towel and sheet found in Noel's apartment. *See* Gov't's Mot., Ex. E (Test. of Alvin E. Hodge) ("Hodge Test.") at 554–55, ECF No. 79-3. Hodge had a bachelor of science degree in pharmacy and was a registered pharmacist in Oregon and Illinois. *Id*. at 555. At the time of the trial, Hodge was also enrolled in a masters program in forensic science at the George Washington University. *Id*. Asked about his experience, Hodge estimated that he had conducted

"thousands" of serology examinations, *id*. at 556, and that he had testified in state courts in multiple states "somewhere between 15 and 18 times," *id*. at 557, but had not previously testified in federal court, *id*. After the government's proffer, the defense did not object, and Hodge was found by the Court to be qualified to provide expert testimony. *See id*. at 558.

Asked about his normal procedures of analysis, Hodge described a three-step process. The first step involved a "visual inspection," sometimes under "ultraviolet light" to identify stains on a given piece of evidence. *Id*. at 556. The second involved "two chemical tests." *Id*. Without explaining which chemicals were used, how the chemicals were applied or the type of chemical reaction or result expected, Hodge stated that these tests were "not a conclusive type test" but were instead "indicative of seminal fluid." *Id*. The purpose of chemical testing, then, was "strictly to find the best stain for a microscopic examination." *Id*. Such microscopic examination was the third step. Hodge did not explain precisely how, under a microscope, he would subsequently identify semen; instead, he stated simply that one could so "identify the male reproductive cell or spermatozoa," adding that microscopic examination was "a positive test." *Id*.

Hodge then testified that he identified semen on three items presented as government exhibits: a "green towel" and "bedspread" taken from the Noel's apartment, and a vaginal swab from Noel's body. *See id*. at 558–59. He did not specifically describe the application of his three-step process to each of these items. Rather, he simply stated his conclusion, that on each item, he "identified the male reproductive cell or spermatozoa." *See id*. at 559. Hodge did not match the purported semen stains to the defendant. The purpose of his testimony was only to prove that semen had been found on Noel's body and in her apartment.

As with Mullinax, Hodge was admitted as an expert before the adoption of Federal Rule of Evidence 702 and without any specific findings by the Court as to the reliability and scientific validity of Hodge's methods of analysis. *See id*. at 588. The evidence Hodge tested no longer exists, *see* Gov't's Opp'n at 4–5, and Hodge, who is deceased, is unavailable to give any further testimony, *id.* at 37. Hodge's testimony contains no specific information about whether his method of analysis had been tested, subjected to peer review, had a known error rate, or was generally accepted in the relevant scientific community, leaving no means of assessing the factors articulated in *Daubert* for consideration of scientific validity. *See Daubert*, 509 U.S. at 593–94; *Ambrosini*, 101 F.3d at 134. Since Hodge did not explain exactly how he microscopically identified spermatozoa, or the extent to which such cells were apparent on any of the items tested, determining whether Hodge's testimony was "based on 'scientific knowledge'" requires a contextual leap of faith. *McGill*, 815 F.3d at 903 (quoting *Daubert*, 509 U.S. at 592). This is simply insufficient under Rule 702 and *Daubert*.

The government, meanwhile, has made no specific argument as to why Hodge's testimony should be admissible under Rule 702, and has therefore failed to meet its burden under *Daubert*. *See McGill*, 815 F.3d at 903. For these reasons, Hodge's testimony is inadmissible under Rule 702 and is excluded.

### c. *Cortland Cunningham*

The government called Special Agent Cortland Cunningham, who worked in the Firearms Identification Unit of the FBI Laboratory in Washington, D.C., to testify about the bullet that killed Noel and the gun seized from the defendant at the time of his arrest. *See* Gov't's Mot., Ex. C (Test. of Cortland Cunningham) ("Cunningham Test.") at 572, ECF No. 79-2. At the time of the trial, Cunningham had worked in the Firearms Identification Unit for "over

13 and a half years." *Id*. In this capacity, Cunningham "underwent an extensive training course under the supervision of experienced examiners in the field of firearms identification," which consisted of "thousands of examinations and comparisons of bullets, cartridge cases and weapons." *Id*. at 573. In addition, he undertook "extensive reading on the subject," "conducted research," and did "thousands of examinations on [his] own." *Id*. During his career, Cunningham had testified as an expert in court "over 250 times." *Id*. The government proffered Cunningham as "an expert witness in the area of firearms identification," and he was qualified as such without objection from the defense. *Id*.

Cunningham then gave testimony regarding two government exhibits, Nos. 14 and 34. Exhibit No. 14 was the bullet that killed Noel, *see id*. at 574–75, and Exhibit No. 34 was the gun seized from the defendant, *see* Cunningham Test. at 574; Gov't's Opp'n at 6. Cunningham testified that he had examined the bullet "for caliber and type" as well as for "rifling characteristics," which he defined as "the number of grooves in the barrel, the width of those grooves, and the direction of twists of the rifle." Cunningham Test. at 574–75. He then "microscopically examined the bullet for the presence of any individual characteristic mark by which I could identify it as having been fired from a particular weapon." *Id*. at 575. After conducting these examinations, Cunningham concluded that the bullet was "a .38 caliber metal point bullet which has been fired from a barrel having five grooves, right-hand twist." *Id*.

Separately, Cunningham concluded that the gun seized from the defendant produced "rifling impressions such as those in th[e] bullet." *Id*. Cunningham did not state specifically how he discerned the characteristics of the gun barrel. He went on to explain that because of "the extreme mutilation of the bullet," there were "not sufficient individual characteristic marks remaining on the bullet for identification purposes." *Id*. Thus, while Cunningham testified that

the bullet *could have been* fired from the gun, he was unable to determine conclusively that the bullet *was* fired from the gun. "It could have been fired from this weapon on the basis of the rifling characteristics," he explained, i*d*. at 578, but "there weren't sufficient microscopic marks for comparison purposes or identification purposes," i*d*. Finally, Cunningham testified that the gun was a "357 Magnum caliber, which is a .38 caliber weapon," and was "made by Smith and Wesson." *Id*.

Firearms identification is part of the forensic discipline known as "toolmark identification." Gov't's Firearms Opp'n, Ex. B, Statement of Stephen G. Bunch (May 29, 2008) at ¶ 9, ECF No. 114-2. Toolmark examiners inspect marks left by tools on surfaces in order to match particular toolmarks to particular tools. *Id*. Firearms examiners are trained to identify three types of markings, known as "class characteristics," "subclass characteristics," and "individual characteristics." *Id*. at ¶¶ 14. Class characteristics are markings left on fired bullets that "allow an examiner to narrow the class of firearm possibilities to certain types of guns made by certain manufacturers." *Id*. at ¶ 15. These characteristics include the diameter or "caliber" of the bullet, and impressions made on the bullet by the barrel of the gun. *Id*. These "rifling impressions" are produced by grooves cut into gun barrels, which are designed to impart spin on fired bullets and thereby ensure accuracy. *Id*. at ¶ 12. Such spin is referred to as "twist." *Id*. Unlike class characteristics, individual characteristics are used to positively match particular bullets to particular guns. *Id*. at ¶¶ 16–29. Individual characteristics "consist of microscopic, random imperfections in the barrel or firing mechanism created by the manufacturing process, wear, corrosion, or abuse." *Id*. at ¶ 16. Firearms examiners engage in a process known as "pattern matching" to determine whether such microscopic imperfections allow for a positive identification between a specific bullet having been fired from a specific gun. *Id*. at ¶¶ 19–29.

Cunningham's testimony concerned class characteristics, not individual characteristics. Cunningham examined the bullet for "rifling characteristics," determined the bullet's caliber and type, and determined that the bullet had been "fired from a barrel having five grooves, right-hand twist." Cunningham Test. at 575. He did not draw any conclusions based on microscopic identification markings. Given the damage to the bullet, Cunningham stated that it lacked "individual characteristic marks … for identification purposes," *id.*, and therefore refrained from positively matching the bullet to the gun, *see id.* at 578.

The defendant argues that all firearms toolmark analysis lacks scientific validity, and that Cunningham's testimony should therefore be excluded. *See* Def.'s Firearms Mot. at 22–25. To support this argument, the defendant relies on three studies issued between 2008 and 2016 by the National Research Council and the President's Council of Advisors on Science and Technology. *See* Def.'s Firearms Mot., Appendix, ECF No. 101-1 (containing extracts from: (1) National Research Council, Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, *Ballistics Imaging* (2008) ("NRC Ballistics Imaging Report"); (2) National Research Council, Committee on Identifying the Needs of the Forensic Science Community, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ("NRC Forensic Science Report"); and (3) President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Validity of Feature-Comparison Methods* (2016) ("PCAST Report")). These reports question the validity of the methods used to analyze individual characteristics and uniquely match particular bullets to particular guns and raise questions about whether the subjective criteria used to determine "sufficient agreement"— the standard on which positive identifications are made—are reliable and reproducible. *See* NRC Ballistics Imaging Report at 3, 65, 70–85; NRC Forensic Science Report at 153–55; PCAST

Report at 104–05. As such, these reports are largely inapposite to Cunningham's testimony, which assesses class characteristics, not individual characteristics. Indeed, the reports cited by the defendant appear to confirm that the methods used to analyze *class characteristics* remain valid. *See, e.g.*, NRC Forensic Science Report at 154 ("The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark."). The defendant's arguments questioning the scientific validity firearms toolmark examination in the abstract similarly focus on uniqueness and "sufficient agreement." *See* Def.'s Firearms Mot. at 22 (listing three bases for questioning the validity of firearms analysis: (1) the assumption that "every firearm has unique characteristics … which consistently produce unique marks on bullets and shell casings;" (2) "the field assumes that examiners, based on experience and judgment, can identify and distinguish these 'unique' accidental marks;" and (3) "[t]here is no standard for what constitutes 'sufficient agreement'…"). Since Cunningham did not claim to match the bullet that killed Noel as necessarily being fired from the defendant's gun, these arguments are simply not relevant.

Nonetheless, the government still cannot meet its burden under *Daubert*. The government is correct in arguing that Cunningham had ample experience and training, since Cunningham had worked in the FBI's Firearms Identification Unit for thirteen and a half years, received "extensive" formal training, conducted "thousands" of firearms examinations, and testified in court as an expert more than 250 times. *See* Cunningham Test. at 572–73. In addition, Cunningham's analysis of the bullet comports with modern standards. Unlike Mullinax, Cunningham made notes recording the phases of his examination, which survive alongside his trial testimony. *See* Gov't's Firearms Opp'n at 13–15. Cunningham first inspected the bullet in December 1971, at which point he discerned the following class characteristics: the

weight of the bullet; damage to the bullet's nose; two raised impressions ("lands") and two notched impressions ("grooves"); the size of these impressions; and a rightward spin or "twist." *See* Gov't's Firearms Opp'n at 14; Gov't's Firearms Opp'n, Ex. F, Laboratory Work Sheet (Dec. 17, 1971) ("Dec. 17, 1971 Worksheet") at 1, ECF No. 114-6. From these observations, Cunningham concluded, as he later testified, that "Specimen Q61 [the bullet] is a .38 Special 'metal point' bullet which has been fired from a barrel having five lands and grooves, right twist." Dec. 17, 1971 Worksheet at 2; Cunningham Test. at 575. This analysis occurred before Cunningham was given the gun, in February 1972. *See* Gov't's Firearms Opp'n at 25; Gov't's Firearms Opp'n, Ex. E, FBI Laboratory Report (Feb. 15, 1972) ("Feb. 15, 1972 Lab Report"), ECF No. 114-5. Thus, this chronology ameliorates concern that Cunningham improperly reasoned backward, or that knowledge of the gun improperly influenced his examination of the bullet.

The record does not explain, however, how Cunningham inspected and measured the gun or how he determined that the gun's barrel had five grooves and a rightward twist. In February, 1972, Cunningham compared the bullet to the gun, at which point he concluded: "[t]he rifling impressions in specimen Q61 are the same as those produced by the Q25 .357 Magnum Smith and Wesson revolver, Serial Number K990647 which was submitted in your case entitled, 'John Ausby, Suspect; Sharon Tapp and Sheral Frahm, Victims; Homicide.'" Feb. 15, 1972 Lab Report at 1. As he later testified at trial, Cunningham also concluded that there were "not sufficient microscopic marks remaining on this bullet to identify the weapon from which it was fired." *Id*; Cunningham Test. at 575–76. Yet, as the government concedes, "we do not know how [Cunningham] included the firearm recovered from the defendant as of a class of firearms that could have been used to fire the bullet recovered from Ms. Noel." Gov't's Firearms Opp'n

at 24. According to the government, Cunningham *could have* reached his conclusions regarding the gun in one of three ways: (1) by applying a mathematical formula to the rifling marks on the bullet; (2) using a General Rifling Characteristics table listing the characteristics of particular firearm models; or (3) by comparing the bullet with a sample bullet test fired using a known .357 Smith and Wesson revolver. *Id.* Neither Cunningham's trial testimony nor his examination notes reveal which of these three methods Cunningham might have used, or if he used any of them at all. In this regard, Cunningham's unavailability, coupled with the destruction of the crucial evidence, makes it impossible to know with certainty whether Cunningham's conclusions were "based on sufficient facts or data" and the "product of reliable principles and methods." Fed. R. Evid. 702(b)-(c).

The record is similarly silent as to whether Cunningham's analysis was verified by another agent at the time. Verification is a standard practice in modern firearms toolmark analysis. *See* Gov't's Firearms Opp'n at 9; *United States v. Monteiro*, 407 F. Supp. 2d 351, 368–69 (D.Mass. 2006). The government concedes that "[i]t is unclear whether Special Agent Cunningham's conclusions were verified," since there is "no indication of verification in [his] firearms reports or notes." Gov't's Firearms Opp'n at 9, n.6. Again, no means of supplementing the record as to whether Cunningham's analysis was verified exists, since Cunningham is unavailable to testify and the underlying evidence has been lost or destroyed.

As the government correctly points out, recent cases addressing the admissibility of firearms identification evidence under *Daubert* have concluded that such evidence is admissible even after considering, in detail, the three scientific studies cited by the defendant. *See United States v. Green*, 405 F. Supp. 2d 104 (D.Mass. 2005); *Monteiro*, 407 F. Supp. 2d 351; *United States v. Diaz*, No. 05-cr-167 (WHA), 2007 WL 485967, (N.D. Cal. Feb. 12, 2007); *United*

*States v. Johnson*, No. 16-cr-281 (PGG), 2019 WL 1130258, (Mar. 11, 2019). The result here is different because the highly unusual circumstances of this case make full appraisal of the methods of analysis Cunningham used impossible. In *Monteiro*, the court held a six-day evidentiary hearing in which testimony was heard from six expert witnesses, including the forensic ballistics analyst whose admission the defendant had challenged. *Monteiro*, 407 F. Supp. 2d at 355. In *Johnson*, the court similarly held a *Daubert* hearing concerning the specific methodology of the government's firearms toolmark expert. *Johnson*, 2019 WL 1130258, at *2. In both cases, these hearings allowed the court to make specific findings regarding multiple *Daubert* factors, including the error rates, testability, peer review, and general acceptance within the scientific community, of the methods of analysis actually employed. *See Monteiro*, 407 F. Supp. 2d at 365–73; *Johnson*, 2019 WL 1130258, at *14–19; *see also Green*, 405 F. Supp. 2d at 119–123; *Diaz*, 2007 WL 485967, at *5–13. Such detailed analysis is not possible here, where the government's proffered expert is unavailable and no evidentiary hearing may be held on the reliability of the specific methods he used because those methods are unknown and now unknowable.

For these reasons, the government cannot meet its burden under Rule 702 and *Daubert*, and Cunningham's testimony must be excluded.[9]

## IV.   CONCLUSION

For the foregoing reasons, the government's motion to admit the trial transcripts of the twelve unavailable original trial witnesses, pursuant to Rules 804(b)(1), 403, and 702, is GRANTED IN PART and DENIED IN PART. Specifically, the government may admit at trial,

---

[9] Even if Cunningham's proffered expert testimony were admissible under Rule 702, this would not assure its admission since this testimony might nonetheless be excluded as not relevant should the defendant's Motion to Suppress Tangible Evidence, ECF No. 80, be granted and evidence regarding the gun seized from the defendant upon his arrest in New York suppressed. *See supra* n.6.

subject to resolution of any other relevant defense motion, portions of the prior trial testimony of Otis Fickling, Gov't's Mot., Ex. D (Test. of Otis Fickling), ECF No. 79-2, and Charles Joseph Wesley, *id.*, Ex. L (Test. of Charles Joseph Wesley), ECF No. 79-10, but the remainder of the proffered trial testimony of the unavailable witnesses is excluded.  Likewise, the defendant's motions to exclude are GRANTED with respect to the government's proffered prior trial testimony of Donald Cherry, Robert Laughery, Alfred Walton, Grace Thompson Pyles, Dorothy Rager, George Elgy Crockett, Susan Shook, Joseph Mullinax, Alvin Hodge, and Cortland Cunningham; and GRANTED IN PART with respect to the prior trial testimony of Otis Fickling and Charles Joseph Wesley.

The parties are further directed to submit jointly, by January 3, 2019, a status report identifying, in light of this Memorandum Opinion, which, if any, of the remaining pending motions may be denied as moot and whether the government is prepared to go forward with the retrial currently scheduled for January 27, 2020.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 20, 2019

_____
BERYL A. HOWELL
Chief Judge